William DE VAN

v.

PENNSYLVANIA RAILROAD COMPANY.

GRACE LINE, INC.,

v.

INDEPENDENT PIER COMPANY, Impleaded Respondent.

No. 353 of 1956.

United States District Court
E. D. Pennsylvania.

Oct. 28, 1958.

Milton M. Borowsky (of Freedman, Landy & Lorry), Philadelphia, Pa., for libellant.

Theodore Voorhees (of Barnes, Dechert, Price, Myers & Rhoads), Philadelphia, Pa., for respondent Pennsylvania R. Co.

Thomas E. Byrne, Jr. (of Krusen, Evans & Shaw), Philadelphia, Pa., for respondent Grace Line, Inc.

Francis A. Scanlan (of Kelly, Deasey & Scanlan), Philadelphia, Pa., for impleaded respondent Independent Pier Co.

VAN DUSEN, District Judge.

### I. Findings of Fact

The trial judge makes the following findings of fact:

1. On or about December 20, 1954, libellant was in the employ of Independent Pier Company, impleaded respondent, as a longshoreman on the Philadelphia waterfront.

2. Pennsylvania Railroad Company, respondent, is a Pennsylvania corporation engaged, inter alia, in the transportation of goods upon navigable waters of this country in interstate commerce by barge, lighter, carfloat and otherwise.

3. On or about December 20, 1954, Independent Pier Company was engaged in loading a cargo of heavy lengths of pipe from two carfloats owned by Pennsylvania Railroad Company onto the S.S. Santa Clara, which was owned by respondent Grace Line, Inc. (a New York corporation) and was located on the north

side of Pier 55 South, by virtue of an agreement with Grace Line, Inc., or its agents.

4. No personnel of Pennsylvania Railroad Company were stationed aboard either carfloat after it had been left alongside the north side of the S.S. Santa Clara (hereinafter sometimes referred to as the "ship"). This was in accordance with the customary practice in the ports of Philadelphia and New York.

5. Since prior to December 1954, it has been the customary practice in the port of Philadelphia to moor carfloats to the side of a vessel, which is alongside a pier, with only a bow and a stern line, in the absence of unusual weather conditions or other unusual circumstances, neither of which were present in this case (see Railroad's Request for Finding of Fact 10).

6. At Piers 53 South and 55 South, Philadelphia, there was a northwest wind, which was not in excess of 15 knots (due to the housing on Pier 53 South), from 4 to 6 P.M. on the afternoon of December 20, 1954.

7. The following requests for findings of fact of respondent Pennsylvania Railroad Company are adopted as findings of fact of the trial judge: 1; 2; 3, with the last seven words modified to read "to the starboard side of the ship";[1] 4; 5; 6, with the words "About 12:20 p. m." inserted at the beginning of the sentence, the last seven words eliminated, and the words, "and on the north side of," inserted after the word "to";[2] 7; 8, with "3:30" substituted for "4:00"; 9; 10; 12 to 16; 17 and 18, with the words "forward of" substituted for the words "in from" in both paragraphs; 19 to 21; 22, with the words "in an operation such as that involved in this case" inserted at the end of the sentence; 23 to 30;[3] 32 to 36;[4] 37, with "toward Delaware Avenue" substituted for "facing 514"; 38 to 45;[5] 47, with the words "Several witnesses testified that" inserted at the beginning of the paragraph; 48, with the words "a person supposed by them to be" inserted before the word "ship's"; 49; 50; 52, with the last five words deleted; and 53 to 55.

8. The following requests for findings of fact of impleaded respondent, In-

---

1. Mr. Zarelli testified that the bow of Carfloat 522 was 50 feet aft of the stem of the ship (N.T. 1200a), which would place the stern of that carfloat just forward of the No. 4 hatch (Exhibit L–11). If Zarrelli's testimony is correct on this point (and it is unnecessary to decide this), the carfloat must have been moved aft prior to unloading, which commenced about 11 A.M. according to the ship's log (Exhibits L–8A and L–8B). Since the stevedores at the No. 4 hatch resumed work at about 10:30 A.M., they may have moved the carfloat aft or, possibly, the ship's personnel did this. In any event, by 11 A.M., when discharge of the pipe from the three cars on Carfloat 512 into the No. 4 hatch started, the carfloat was moored at the No. 4 hatch. The cars (two on one rail and one on the other) were approximately in the center, or slightly toward the stern from the center, of that carfloat (N.T. 1199, 1202).

2. After "1424", these numbers should be inserted in the parentheses: "1470–a, 1684–5." This finding is based on the testimony of Bredell, Schust and Zarel-

li, which the trial judge found persuasive. See references to notes of testimony at pp. 14 ff. of the Railroad's brief. Chief Mate Rachuba admitted that on the day of the accident, the two floats were tied up side by side (N.T. 1684–5). The fact that the regular captain was not on the tug and the trip to Gloucester with Messrs. Hunt and Schust would serve to make this an unusual, more memorable than average day in the life of the tug personnel. Mr. Ziegler testified that he did not recall the conversation with Mr. Schust on December 20, 1954, but he did not deny that this conversation took place and admitted that he was on the ship that day (N.T. 1480–2).

3. Paragraph 31 is rejected because it is a conclusion of law.

4. N. T. references 688, 700 and 1006 and Exhibits L–8A and L–8B should be added to the other references in the parentheses.

5. Insert "RP–6" in parentheses at the end of paragraph 39 and "N.T. 1533–4" in parentheses at the end of paragraph 45.

dependent Pier Company, are adopted as findings of fact of the trial judge: 1 to 8; 9, with the words "the No. 4 hatch of" deleted; 10, with the words "alongside the ship" substituted for "at the No. 4 hatch" and the word "shortly" deleted; 12, with "after" substituted for "around" in the first sentence; 13; 14; 15, with the fourth sentence deleted; 16, with "necessity for" deleted and "of" inserted after "re-rigging"; 17, with the last sentence deleted; and 21.

9. Carfloat 514 was moored to the north side of the ship at the No. 2 hatch by either personnel of the Independent Pier Company or personnel of the ship between 12:20 P.M. and 4 P.M. on December 20, 1954.

10. The ship or stevedoring personnel place the eye of the carfloat lines over a bollard, cleat, padeye, or similar appurtenance on the ship's deck and the lines are tightened at the cleats on the carfloat. The ship's personnel normally see that the lines are taut when the carfloat is first moored and observe the lines to see if they are excessively slack from time to time as they walk about the ship (deposition of Beresheim 8–10, 12–14, 17, N.T. 190).

11. Chief Mate Rachuba made no observation or inquiry with respect to the hook used by the stevedores and made no observation concerning the degree of slackness of the lines from the ship to Carfloat 514.

12. The engines of the steam tug Camden are very quiet, even when it is operating at full speed. Personnel stationed on Carfloat 514 moored on the forward north side of a ship berthed at the north side of Pier 55 South cannot hear, under conditions similar to those existing at 5 P.M. on December 20, 1954, any appreciable noise from these engines, even though they are operating at full speed and the tug is approximately 50 feet toward the Delaware River from the carfloat.

13. Although the Camden stirs up considerable water at its stern when its

engines are at full speed, the effect of this water on movement of Carfloat 514, loaded as it was at 5 P.M. on December 20, 1954, would not be significant,[6] assuming the lines of the 514 were taut and the Camden was 50 feet toward the Delaware River from the carfloat with its bow toward the river, as described by the witnesses of libellant.

14. The breaking out of the pipe from Carfloat 514 on the afternoon of December 20, 1954, was a very delicate and dangerous operation, which required all feasible care and safety precautions [see testimony of gang foreman Evers on cross-examination and of employees of Benjamin F. Shaw Company (hereinafter sometimes called "the Shaw pipe company") on 10/16/58].

15. On December 20, 1954, the impleaded respondent was discharging the pipe from the cars on Carfloat 514 into the ship, pursuant to its agreement of 4/17/54 with respondent Grace Line, Inc. (Exhibit RG–5).

16. The end of the booms extending over the starboard side of the ship at the No. 2 hatch were more than 25 feet above the top of the gondola car in which libellant was working at the time of the accident.

17. The cargo hook (RP–8) used in this operation was not reasonably fit for the purpose for which it was being used in breaking out the pipe at 5 P.M. on December 20, 1954.

18. The following requests for findings of fact of respondent Grace Line, Inc., are adopted as findings of fact of the trial judge: 1; 2, with the words "the No. 4 hatch of" deleted; and 5.

All requests for findings of fact not mentioned in paragraphs 7, 8 and 18 above are denied.

## II. Discussion

In this admiralty action, libellant, a stevedoring employee of the impleaded respondent, seeks to recover from (a) the Pennsylvania Railroad Company, on

6. By "significant," the trial judge means that the backwash would not have made

the carfloat bob up and down as described by libellant's witnesses.

whose carfloat was located the gondola car containing the four-ton piece of pipe which "rolled over" [7] crushing his leg, and (b) Grace Line, Inc., into whose ship the pipe was being discharged. Grace Line, Inc., filed a petition (claiming indemnity and/or contribution if it is found liable) to implead the stevedoring company (Independent Pier Company, hereinafter sometimes called "Independent") which was performing stevedoring services under contract with it (see Exhibit RG–5). Respondent Pennsylvania Railroad Company filed cross-libels against Independent and Grace Line, Inc. Also, Grace Line, Inc., filed a cross-libel against the Railroad.

During the trial, the respondents and the impleaded respondent reached an agreement with the libellant and stipulated that the case should proceed to trial on the issue of liability only (N.T. 1677–9).

A. *Liability of Pennsylvania Railroad Company*

■ The trial judge has reluctantly come to the conclusion that libellant and his witnesses did not testify accurately as to the existence and effect on Carfloat 514 of backwash from this respondent's tub Camden. A summary of the reasons for the trial judge's findings follows:

(a) The testimony of libellant's witnesses, such as Kulbusauskas, that he heard loud noises from the engines of the tug from the vessel's deck is incredible in view of the demonstration on May 27, 1958, in the slip between Piers 53 South and 55 South.[8]

(b) This same demonstration disclosed that even if the tug had been headed toward the river (which the trial judge finds is not the fact), the carfloat hardly moved forward toward Delaware Avenue at all when the tug proceeded toward the river full speed and there was only a very slight movement up and down of the carfloat.[9]

(c) The experts (such as Good, Kane and Campbell) testified that the method of coming into a slip slowly, bow first, and pulling Carfloat 522 out with the tug in reverse was a safe and proper way for the tug to remove that carfloat. No explanation has been given of why the tug would come into the float and turn around (in an arc or by backing and filling), as testified to by libellant's witnesses.

(d) The corroboration of the tug crew by the Chief Mate in admitting that at one point during the day he saw the two carfloats moored alongside each other (N.T. 1684–5).

(e) McGovern's testimony that the S.S. Othem was moored on the south side of Pier 53 South on December 20, 1954, making it most unlikely that there would have been room for the tug to turn around in the slip, much less wait alongside the south side of Pier 53 South as testified to by at least one of libellant's witnesses.[10]

(f) The libellant's witnesses did not seem to the trial judge as accurate as

---

7. See Exhibits L–19 and L–20.

8. Immediately after this demonstration, the trial judge made notes of his observations, which include the following: "The tug's engines were very quiet and I could not hear any appreciable noise when standing on the 514, even when the tug's engines were at full speed ahead."

9. Although the tug made considerable backwash or "smart water," this had virtually no effect whatever on the carfloat.

10. Independent argues that the record does not show the size of the S.S. Othem or whether it was moored at the Dela-

ware Avenue end or the river end of Pier 53 South, and there may have been room for the tug to turn around forward of the S.S. Othem. Although the record is not complete on this point, it is strange that none of libellant's or Independent's witnesses who were able to see the tug's position so well in the dark (cf. Krzyk's testimony that he could tell the tug was proceeding forward toward the river, rather than in reverse, even though there is no testimony that he was even near the rail of the ship) mentioned that another ship was located so near the spot (south side of Pier 53 South) where the tug was reported to be.

Zarelli, Bredell, Schust, Good and Brown.[11]

■■ The carfloat was a proper vessel to use to bring this pipe alongside under the facts of this case.[12] The Railroad could not be responsible for any slackness in the lines on Carfloat 514, since it did not place that carfloat alongside the vessel. The record does not establish any liability on the Railroad on the basis of either negligence or unseaworthiness.[13]

Grace Line, Inc., has failed to establish its burden of proving the Railroad liable on its cross-claim.

B. *Liability of Grace Line, Inc.*

■ After careful consideration, the trial judge has concluded that the cargo hook was not a proper and safe hook for use in breaking out the pipe on the facts in this case. All the witnesses have testified that breaking out pipe of the type involved in this case from a gondola car is a dangerous undertaking and the maximum safety precautions must be taken, even if the car is on land or on a fixed pier (N.T. 6–7 of 10/16/58 testimony—Document No. 48 in Clerk's file—and Finding of Fact 14). In this case, there were the extra hazards (a) of possible swaying due to the long (over 25 feet long—see Finding of Fact 16) cable from the end of the boom to the pipe, (b) of the movement of the carfloat both forward and aft, as well as away from and toward the ship's side, and (c) of the possible slipping of the override on the winch, among other factors of danger. During the demonstration on May 27, 1958, the pipe swayed at least four feet toward the ship on one occasion when it was being broken out and the hatch tender had it promptly lowered back to the bottom of the car to stop the sway.[14] If the sway had continued, the hook would have slipped out of the end of the piece of pipe.[15] In the absence of the use of 4″ x 4″, 4″ x 6″, 6″ x 6″, or similar large chocks to prevent the pipe

11. The statements marked RI–1 and RI–2 are consistent with the testimony of Zarelli and Bredell that the tug waited, bow toward Delaware Avenue, at the north side of Carfloat 522 until its assistance was requested in moving libellant to the Delaware Avenue bulkhead, which request was made after the accident. The fact that these statements are incorrect in their general statements as to the places where the carfloats were placed by the tug in the morning does not seem particularly significant to the trial judge, since one carfloat was forward and one aft when the tug was there in the late afternoon, which would have been the last view of the locations of the carfloats in the witnesses' minds. The libellant's witnesses seemed to be too united in their efforts to place the blame on the tug, and also generally more inaccurate than the Railroad's witnesses. The statements concerning the tug in L–19 and L–20 and the testimony of the ship's witness, Rachuba, were admittedly based on hearsay information. See, also, fn. 2. Compare the testimony re the alleged officer's hat.

12. Although libellant's counsel took the position that the carfloat was an improper vessel, the testimony of Good and Carlsen, as supplemented by the demonstration of 5/27/58, has persuaded the trial judge that the carfloat was an appropriate and proper vessel on the evidence in this record.

13. Cole (supervisor for Independent) testified that gondola cars delivering this type of pipe alongside ships did not have scantling or chocks.

14. The notes taken by the trial judge contain this language: "Pipe swayed from side to side with hook in it when pipe was raised the distance testified to by witnesses. The pipe swayed from side to side several feet and dangerously in spite of no movement of carfloat on one occasion. Safest method would appear to be to put chocks of 6″ x 6″ or 4″ x 6″ on each side between raised piece and other pieces of pipe in order to prevent raised pipe from swaying."

15. Both L–19 and L–20 describe the pipe as "rolling over" libellant's left leg, which indicates that the pipe may have swayed on December 20, 1954. Libellant testified that the pipe swayed just before it fell on his leg (N.T. 562). Cole admitted that when unloading this inshore car, the angle of the falls might make the hook turn (N.T. 1629–30). Cole knew of at least one other occasion where similar pipe had fallen when using this cargo hook in this way.

from swaying and falling back into place, a pipe hook of a shape similar to RI–6, or to those shown on RP–9, RP–10, or RP–21 to 26, should be used.

■ The testimony of Hickman, Carlsen, Kull, and the employees of the Shaw pipe company establishes that a hook extending at least 6 inches into the mouth of the pipe is needed for safety reasons in breaking out pipe of this type under these circumstances.[16] The trial judge was not persuaded by the testimony of Captains Campbell and Stange that, because cargo hooks of the type of RP–8 [17] are customarily used to break out this type pipe in the port of Philadelphia, this was a safe hook.[18] Both these witnesses for Independent admitted that a hook of the type of RI–6 would be strong enough to break out this pipe if it was made of tool steel. A sudden jerk in the operation of the winch, due to either mechanical or human failure, would involve a serious risk of a cargo hook's slipping out of the pipe end when it is at the end of a 25 foot long wire cable leading to a float which admittedly may move at least one foot in any one of four directions.

C. *Liability of Independent Pier Company*

■ In view of the finding that the hook was not safe or fit for the purpose for which it was being used and the responsibilities of Independent under its agreement with the ship (Exhibit RG–5), it is unnecessary to decide whether the lines were excessively slack and whether the boom was correctly placed at 5 P.M. on December 20, 1954.[19]

■ The record makes clear that both the ship's personnel and the stevedoring personnel considered that any slackness in the carfloat lines which became apparent during the unloading operation was to be remedied by the stevedores who were on the carfloat, acting under the supervision of the hatch foreman on the deck of the ship. The maintenance

16. N.T. 4, 5, and 14 of 10/16/58 testimony recorded as Document No. 48 in Clerk's file. Wherever possible, the employees of the Shaw pipe company insert a long, 4" x 4" timber into heavy pipe for breaking out purposes (N.T. 6, 10, 11–12 and 13 of testimony of 10/16/58, Document No. 48 in Clerk's file).

17. When the Shaw pipe company does use a hook for breaking out pipe, there is a longer distance between the point of the hook and the back of the hook so that the point extends further into the pipe. Also, there is no bill on the hooks used by the Shaw pipe company.

18. Even though it may be customary in the port of Philadelphia to use a cargo hook such as RP–8 to break out heavy pipe, this does not necessarily establish that such a hook is fit for the intended purpose and seaworthy. The following principle, as stated by the United States Supreme Court, is equally applicable to the contention that customary use of an appliance establishes that that appliance is seaworthy:

"What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a (legal) standard * * *, whether it usually is complied with or not."

See Texas & Pacific R. Co. v. Behymer, 1903, 189 U.S. 468, 470, 23 S.Ct. 622,

623, 47 L.Ed. 905. It is noted that Captain Stange had no experience with loading pipe into a ship under the same circumstances as those disclosed by this record.

19. It is also unnecessary to decide whether the respondent shipowner was negligent in the several respects claimed at pages 20–25 of the Railroad brief. It is noted that the shipowner apparently cannot be held liable on the ground of unseaworthiness for improper use of fit and proper appliances. See Burkholder v. United States, D.C.E.D.Pa.1944, 60 F. Supp. 700, 702; Ludvigsen v. Commercial Stevedoring Co., D.C.E.D.N.Y.1955, 131 F.Supp. 337; Imperial Oil, Limited, v. Drlik, 6 Cir., 1956, 234 F.2d 4. In the Imperial Oil case, supra, the court said at page 8 of 234 F.2d:

"The accident arose out of the negligent use of seaworthy equipment. The obligation of the vessel owner to provide seaworthy appliances has not been extended to require the owner to keep those appliances from being used in a negligent manner. If so used, liability rests upon negligence rather than upon unseaworthiness."

The record does not establish that the ship had unfit or improperly experienced personnel.

of these lines in safe condition was the responsibility of Independent, as between that company and the shipowner. Under the terms of the agreement (Exhibit RG–5) [20], Independent was bound, at the least, to conduct the loading operation in a reasonably safe manner. See Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133. At the most, the ship's personnel were responsible to observe the condition of the lines on their periodic tours around the ship, whereas the stevedoring personnel were constantly in a position to observe these lines, as well as the effects of any slackness, and to correct any slackness during the loading of the pipe into the No. 2 hatch.

Under these circumstances, if the lines to the carfloat were excessively slack, Independent is the party legally responsible for such condition and the substantial cause of the accident was their failure to keep the lines taut. See Hagans v. Farrell Lines, 3 Cir., 1956, 237 F.2d 477, 480.

Similarly, if the booms were improperly located with relation to the pipe in the gondola cars, this was the responsibility of Independent as it was the substantial cause of any such impropriety.

██ Independent contended at the trial that its responsibility for the method of loading and the supervision of loading was modified by Section 11 of the agreement (Exhibit RG–5) which reads:

"*Stowage:*

"Stevedore to handle and stow cargoes to the satisfaction and under the direction and supervision of ship's representative (and) underwriter's representative."

In the first place, this clause refers to "Stowage" in the ship, as opposed to general stevedoring work covered by Section 3 of the agreement, which would seem to cover the loading from the carfloat to the ship. In the second place, even if this clause was intended to cover handling other than that incident to actual stowage in the hold, it gives the ship's representative the power of supervision and general supervision, but would still leave the responsibility for supervising the details of the way the pipe was loaded aboard ship with Independent, unless the ship exercised its supervisory power as to details, which it did not. The supervision of this loading work was left entirely to Cole (Independent's ship foreman), Evers (Independent's gang foreman), and the hatch tender, who was in direct charge of the transfer of the pipe from the carfloat into the hatch where Evers was supervising the stowage. No ship representative gave the stevedoring gang or these supervisors of this gang any directions on the subject of the carfloat, the booms, the rigging, or the method of bringing this pipe aboard.[21]

### III. Conclusions of Law

The trial judge makes the following conclusions of law:

1. The court has jurisdiction of the subject matter and of the parties.

██ 2. The use of an unsafe cargo hook in breaking out the pipe rendered

---

20. Paragraph 3 of Section 3 of the agreement provides:
    "The Contractor also agrees to provide all necessary stevedoring labor, including windmen, hatch tenders, tractor and dock crane operators, also foremen and such other stevedoring supervision as are needed for the proper and efficient conduct of the work, also adjust rigging of booms and guys, etc., at hatches where work of discharging and or loading will be conducted * * *."

21. Since Independent has indicated a possible objection to the trial judge's securing his own testimony from the employees of the Shaw pipe company concerning the suitability of the cargo hook (RP–8), reference is made to Sink, "The Unused Power of a Federal Judge to Call His Own Witness," 29 So.Cal.L.Rev. 195 (1956), and the authorities there cited. Cf. Dinsel v. Pennsylvania Railroad Company, D.C., 1956, 144 F.Supp. 880. See, also, transcript of 9/29/58 (Document No. 47 in Clerk's file), explaining circumstances under which this testimony was taken. There are attached hereto a letter from the trial judge to counsel, dated 10/16/58, offering counsel an opportunity to present additional evidence on 10/23/58 and letters from all counsel declining such opportunity.

the ship unseaworthy and this unseaworthiness was a substantial factor in causing the accident.

3. Grace Line, Inc., is liable to libellant. Petterson v. Alaska S.S. Co., 9 Cir., 1953, 205 F.2d 478, affirmed per curiam, 1954, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798.[22]

4. Since the cargo hook was supplied by Independent Pier Company pursuant to its obligation under the second paragraph of Section 3 of the agreement of April 17, 1954,[23] and Independent's breach of its implied warranty of performing the loading in a workmanlike and safe manner is the substantial cause of the liability of Grace Line, Inc., as stated in Conclusion of Law 3 above, Grace Line, Inc., is entitled to indemnity against Independent Pier Company for the entire amount of such liability. See Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133; Weyerhaeuser S.S. Co. v. Nacirema Operating Co., 1958, 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491.

5. Grace Line, Inc., is not entitled to recover on its cross-libel against Pennsylvania Railroad Company.

6. Pennsylvania Railroad Company and Grace Line, Inc., are entitled to recover from Independent Pier Company their contributions to the settlement.

7. The trial judge adopts paragraphs 1, 2, 11 and 13–14 of the requests for conclusions of law of the Pennsylvania Railroad Company as conclusions of law of the court. All requests for conclusions of law not mentioned in this paragraph are denied.[24]

An order may be submitted by the parties in accordance with these conclusions of law.[25]

---

22. Cf. Crumady v. Joachim Hendrik Fisser, 3 Cir., 1957, 249 F.2d 818, 821, certiorari granted, 1958, 357 U.S. 903, 78 S.Ct. 1150, 2 L.Ed.2d 1154.

23. See Exhibit RG–5. This paragraph reads as follows:
"The contractor (Independent) is to supply all other cargo handling gear and equipment, such as *hooks*, pendants, save-alls, nets, trays, bridle chains and slings * * *." (Emphasis supplied.)

24. By letter of October 20, 1958, attached hereto, counsel were asked to notify the trial judge by October 27, 1958, of any rulings on evidence which they wished him to make. By letters of October 21, 1958, and October 23, 1958, attached hereto, counsel for the Railroad and counsel for Independent Pier Company stated they would not press any objections made and reserved during the trial. Since counsel for Grace Line, Inc. has not answered the letter of October 20, it is assumed that he takes the same position as that stated in the letters of October 21 and October 23 referred to above.

Exhibit L–19 is admissible in evidence as a record kept in the regular course of business. 28 U.S.C.A. § 1732. That part of paragraph 18 stating that "backwash from tug boat caused Pennsylvania Railroad Float 514 to sway" is of little or no weight because it is hearsay and there is no evidence whatever that the person preparing the report had any personal knowledge of this statement.

25. The following briefs submitted by the parties have been placed in the Clerk's file because of their analysis of, and reference to, pages of the notes of testimony:
a. Respondent's, The Pennsylvania Railroad Company, brief in support of its findings of fact and conclusions of law.
b. Brief for defendant, Grace Line, Inc.
c. Brief on behalf of impleaded respondent, Independent Pier Company.
d. Reply brief of respondent, The Pennsylvania Railroad Company.
e. Reply memorandum for Grace Line, Inc.
f. Reply memorandum to respondent Railroad's reply brief filed on behalf of Independent Pier Company.