Bernard **LITWINOWICZ**

v.

**WEYERHAEUSER STEAMSHIP COMPANY**, Defendant and Third-Party Plaintiff,

Nacirema Operating Co., Inc., Third-Party Defendant.

Joseph **MATYAS**

v.

**WEYERHAEUSER STEAMSHIP COMPANY**, Defendant and Third-Party Plaintiff,

Nacirema Operating Co., Inc., Third-Party Defendant.

Civ. A. Nos. 21553, 21554.

United States District Court
E. D. Pennsylvania.
Dec. 21, 1959.

**814**

Freedman, Landy & Lorry, Milton M. Borowsky, Philadelphia, Pa., for plaintiffs.

Krusen, Evans & Shaw, T. E. Byrne, Jr., Philadelphia, Pa., for defendant Weyerhaeuser Steamship Co.

John B. Hannum, 3rd, Philadelphia, Pa., for Nacirema Operating Co., Inc., third-party defendant.

KRAFT, District Judge.

Plaintiffs, longshoremen, instituted separate actions against Weyerhaeuser Steamship Company to recover damages for personal injuries sustained while they were engaged in loading steel beams aboard defendant's vessel. Both complaints alleged negligence and unseaworthiness.

Weyerhaeuser, in both cases, impleaded and sought indemnity from plaintiffs' employer, Nacirema Operating Co., Inc., which had contracted to perform the stevedoring services.

Plaintiffs' actions against Weyerhaeuser were tried before a jury. Pursuant to stipulation, the third-party actions were tried to the court. Seven questions were submitted to the jury under Rule 49. On the basis of the jury's answers, and the court's findings in the third-party actions, judgment was entered for each plaintiff against Weyerhaeuser, and in favor of Weyerhaeuser against Nacirema.

The cases are now before us on Weyerhaeuser's motions to vacate and set aside the judgments, or, in the alternative, for a partial new trial; and on Nacirema's motions to amend the judgment, to amend the findings, to make additional findings, etc., under Rules 52 and 59.

The facts developed at the trial may be briefly stated. On June 18, 1956, the George S. Long, owned and operated by Weyerhaeuser, was docked at Pier 27 North, on the Delaware River, Philadelphia. Plaintiffs were members of a gang engaged in loading steel H-beams aboard the vessel through the No. 2 hatch. The beams were in a railroad gondola car on tracks on the pier beside the vessel. They were 10-inch beams, 30 feet long, and were arranged in 7 tiers, 12 beams to a tier. Each beam was nested into the one above and below.

Plaintiffs were engaged in the "breakout" operation and were working in the railroad car atop the beams. In that operation, one end of a draft of beams was raised to a height sufficient to permit wooden "chocks" to be placed under

the draft, one chock a few feet in from the upraised end of the draft and the other near the middle. The draft was then lowered onto the chocks, and the necessary slings placed around it to hoist it aboard the ship. In breaking-out the draft, the men used a "Baltimore dog", which was furnished by plaintiffs' employer. This device is shaped somewhat like an "L" with the lower lip at right angles to the vertical part of the "L". The "Baltimore dog" was attached to a hook at the end of the ship's cable which ran down from the head of the ship's boom. It was inserted under the beams to be broken-out, and one end of the draft was thus raised by the ship's power.

The accident happened as the first draft was being broken-out of the car. The draft consisted of six beams and was being taken from the middle tier. One of the men placed the "dog" in position, the draft was raised on signal and the plaintiffs placed the chocks under the beams. As the draft was being lowered upon the chocks, the dog "flew off" releasing the beams, which fanned out as they fell and pinned both plaintiffs against the inside of the railroad car.

There was expert testimony that the "Baltimore dog" was neither designed nor intended to lift six beams of such size and was thus being used for a purpose for which it was not intended. Moreover, there was testimony that the "dog" was in a defective, unsafe condition in that its horizontal lip was bent downward about 15° and its vertical shaft was bent out of line about 15°.

In its answers to the interrogatories, the jury found: (1) The "Baltimore break-out dog", in the condition in which it was at the time of the accident, was not a reasonably safe, suitable and proper appliance for the use to which it was then intended to be put; (2) that fact was a substantial factor in causing the plaintiffs' injuries; (3) Weyerhaeuser, under the circumstances which existed at the time of the accident, used reasonable care in keeping the vessel secured to the dock by its mooring lines; (4)

plaintiffs used reasonable care under the circumstances which existed immediately before they were injured. The jury assessed the total damages of the plaintiff Litwinowicz in the amount of $65,-000, and of the plaintiff Matyas in the amount of $75,000.

The jury's findings establish that the plaintiffs' injuries were the result of the unseaworthiness of the vessel and its appliances. Weyerhaeuser's principal contention is that since the plaintiffs were injured while they were in the gondola car on the pier, which is but an extension of the land, they were bound to pursue the remedies afforded by the local law. We do not concur in this view. The decisions, we think, hold that the wrong, arising as it did out of a maritime status or relation, is cognizable by the maritime law.

Plaintiffs rely both upon the general maritime law and upon the Admiralty Jurisdiction Extension Act, 46 U.S.C.A. § 740, which provides in pertinent part that:

> "The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land."

Weyerhaeuser vigorously challenges the constitutionality of the Act. Since the issue before us may be disposed of on other grounds, we do not reach the question of constitutionality and refrain from any opinion thereon. Rescue Army v. Municipal Court of Los Angeles, 1947, 331 U.S. 549, 67 S.Ct. 1409, 91 L. Ed. 1666. It is to be noted, however, that the Act has been held constitutional on at least two occasions. United States v. Matson Navigation Co., 9 Cir., 1953, 201 F.2d 610; American Bridge Co. v. The Gloria O, D.C.E.D.N.Y.1951, 98 F. Supp. 71.

It has been settled law since Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099, that

the shipowner's warranty of seaworthiness extends to longshoremen while on board ship performing work traditionally done by seamen. A review of the case law establishes, we think, that the warranty applies as well to longshoremen injured ashore under comparable conditions.

In O'Donnell v. Great Lakes Dredge & Dock Co., 1943, 318 U.S. 36, 63 S.Ct. 488, 490, 87 L.Ed. 596, the court held that a seaman injured ashore by the owner's negligence had an actionable claim under the Jones Act, 46 U.S.C.A. § 688. It interpreted the phrase, "in the course of his employment", as extending beyond his work on the ship, and supported the power of Congress to deal with transactions ashore, not only as part of its power to regulate interstate commerce, but under its power "to make laws which shall be necessary and proper to carry into execution powers vested by the Constitution in the government or any department of it, Article I, § 8, cl. 18, including the judicial power which, by Article III, § 2, extends 'to all Cases of admiralty and maritime Jurisdiction.'" Left open was the question whether a longshoreman could sue his employer in the same circumstances.

That issue was raised three years later in Swanson v. Marra Bros., Inc., 1946, 328 U.S. 1, 66 S.Ct. 869, 90 L.Ed. 1045, a suit by a longshoreman against his employer under the Jones Act for injuries received ashore, where the plaintiff had sought and received state compensation benefits. Recovery was denied solely on the ground that Congress, by the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq., has restricted the liability of the employer to compensation, but plaintiff's status as a seaman was recognized.

The precise question before us was presented in Strika v. Netherlands Ministry of Traffic, 2 Cir., 1950, 185 F.2d 555, certiorari denied 1951, 341 U.S. 904, 71 S.Ct. 614, 95 L.Ed. 1343. There a longshoreman sustained injuries on a

pier when a pontoon being lifted onto the vessel by the ship's winches, booms and falls fell on him when one of the bridle rings slipped from the hook to which it had been attached. In sustaining a recovery against the shipowner, the court reviewed the O'Donnell and Swanson cases in some detail. Speaking of the plaintiff in Swanson, the court said (185 F.2d at page 557):

"The Court recognized that he was a 'seaman' within the Act, having so held twice before; and it did not intimate that, had there been no Longshoremen's and Harbor Workers' Compensation Act, the same reasoning which had supported a 'seaman's' recovery in (O'Donnell) would not have supported a longshoreman's."

In Strika, as here, the defendant argued that a breach of the obligation to furnish a seaworthy vessel is a tort and that the maritime law had no jurisdiction over such a breach occurring on land. The court's answer seems to us conclusive (185 F.2d at page 558):

"We should have found this a serious obstacle, were it not for O'Donnell v. Great Lakes Dredge & Dock Co., supra, and the ratio decidendi of Swanson v. Marra Brothers, Inc., supra; but those decisions appear to us to settle it that such a tort, arising as it does out of a maritime 'status' or 'relation', is cognizable by the maritime laws whether it arises on sea or on land. *For it seems to us to follow, if Congress has power to impose liabilities in favor of seamen for lapses of care on shore, that Congress at least would have power to impose a similar liability when the lapse is in furnishing a seaworthy ship. It is true that Congress has not intervened as to seaworthiness; yet there is no more reason to circumscribe more narrowly the duty, which The Osceola, supra,[1] established as part of the maritime law, than the Con-*

*stitution circumscribes the power of Congress, for both in the end are based upon the same provisions.*[2] Moreover, we find confirmation for this in the 'obligation' of 'maintenance and cure' of a seaman injured on shore, for that is concededly quite as entirely the creature of the maritime law as the 'obligation' to furnish a seaworthy ship. For these reasons, although we have been unable to find a decision holding that a seaman, injured ashore by unseaworthy ship's gear, can recover, we have no doubt that he could; and, if a seaman can, we see *no reason to question the ability of a longshoreman also to recover, for that follows from the reasoning of Seas Shipping Co. v. Sieracki, supra,*[3] *especially when it is read with the opinion in Swanson v. Marra Brothers, Inc., supra,*[4] Public Law 695 of June 19, 1948, 46 U.S. C.A. 740, *has now probably laid all such doubts, but we think that it was not necessary in order to support a recovery in this particular situation.*" (Emphasis supplied.)

The question has not been expressly adjudicated in our own Circuit. However, in Hagans v. Farrell Lines, Inc., 3 Cir., 1956, 237 F.2d 477, plaintiff longshoreman was on the pier assisting in the unloading of the vessel, when a draft of coca beans being lowered from the ship fell on him as the result of an unseaworthy condition of the winches on the vessel. Judgment for the plaintiff was affirmed on appeal. The questions considered on appeal did not include whether the warranty of seaworthiness extended to plaintiff, but it seems clear that the court assumed that it did.

The Strika case has been followed or cited with approval in several recent cases. Pope & Talbot, Inc. v. Cordray, 9 Cir., 1958, 258 F.2d 214, 216; Valerio v. American President Lines, D.C.S.D. N.Y.1952, 112 F.Supp. 202; Revel v. American Export Lines, Inc., D.C.E.D. Va.1958, 162 F.Supp. 279; Schoening v. 102 Jute Bags, D.C.E.D.Pa.1955, 132 F. Supp. 561.

The authorities relied upon by Weyerhaeuser are not, in our view, determinative of the issue.

We decide, therefore, that the shipowner's warranty of seaworthiness extended to the present plaintiffs, despite the fact that they were injured while participating ashore in the operation of loading ship's cargo.

■ Weyerhaeuser's next contention is that, assuming the applicability of the general maritime law, plaintiffs nevertheless were not individuals to whom the warranty of seaworthiness extends. The nub of the contention is that the plaintiffs were merely preparing the cargo for loading; that they were not doing the actual loading; that their function was comparable to that of a clerk handling shipping papers in an uptown office, or a checker directing traffic at the pier entrance.

This argument is devoid of merit. It is true, as defendant reminds us, that labels are not conclusive. United New York and New Jersey Sandy Hook Pilots Ass'n. v. Halecki, 1959, 358 U.S. 613, 617, 79 S.Ct. 517, 3 L.Ed.2d 541. The fact remains, however, that plaintiffs were *engaged in the work of loading, which is the work of the ship's service,* performed until recent times by members of the crew. Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 96, 66 S.Ct. 872, 90 L.Ed. 1099. It is of no moment that the draft was raised and then lowered onto chocks before it began its upward and lateral movement into the ship. The term loading is not a word of art, and is not to be narrowly and hypertechnically interpreted. Plaintiffs' actions at the time of the accident were direct, necessary steps in the physical transfer of the steel from the railroad car into the

---

2. Article III, Sec. 2.

3. 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099.

4. 328 U.S. 1, 66 S.Ct. 869, 90 L.Ed. 1045.

vessel, which constituted the work of loading.

Since the argument in this case, Weyerhaeuser has favored us with a memorandum—prompted by a remark from the bench—which purports to demonstrate "the fallacy of the rather widely held concept that the work which is today performed by longshoremen was formerly performed by members of the crew". We have read with great interest the many quotations from learned authorities upon this question presented by able counsel for our consideration. For present purposes, however, we must regard the question as no longer open. "Historically the work of loading and unloading is the work of the ship's service, performed until recent times by members of the crew": Seas Shipping Co. v. Sieracki, 328 U.S. 85, 96, 66 S.Ct. 872, 878. Again, referring to a "common core of policy" running through the cases, the Court said (328 U.S. at page 99, 66 S.Ct. at page 879):

> "It is that for injuries incurred while working on board the ship in navigable waters the stevedore is entitled to the seaman's traditional and statutory protections, regardless of the fact that he is employed immediately by another than the owner. For these purposes he is, in short, a seaman because he is doing a seaman's work and incurring a seaman's hazards."

■ Finally, Weyerhaeuser urges that the judgment should be vacated for the additional reason that the defective appliance was not part of the vessel's equipment, but was furnished by Nacirema. We think defendant's position is unsound. The evidence establishes that the "Baltimore dog" was attached to and became a part of the ship's gear. It thus became an appliance appurtenant to the ship. Defendant, under the law could not, by contract or otherwise, delegate to Nacirema the defendant's duty to the plaintiffs to provide a seaworthy vessel and appurtenances. Alaska Steamship Co. v. Petterson, 1954, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798.

Defendant attempts to distinguish Petterson on the ground that "the block which caused the longshoreman's injuries was a device commonly found aboard vessels, as part of the vessel's regular equipment." That the circumstance alluded to was not the determinative factor in the case, however, may be seen from the context in which the statement appears in the opinion of the Court of Appeals (9 Cir., 205 F.2d 478, 479): "It is not clear whether the block belonged to the ship or the Stevedoring Co., it being the type of equipment commonly found as part of the gear of both ships and stevedoring firms." See, also, the dissenting opinion at 347 U.S. 398, 74 S.Ct. 602.

The Petterson case was cited and followed in Rogers v. United States Lines, 1954, 347 U.S. 984, 74 S.Ct. 849, 98 L.Ed. 1120, and our own case, De Van v. Pennsylvania Railroad Company, D.C.E.D. Pa.1958, 167 F.Supp. 336.

Fredericks v. American Export Lines, 2 Cir., 1955, 227 F.2d 450, cited by defendant, is not in point. In that case plaintiff was injured when a skid or platform on which he was working gave way. The skid belonged to the stevedore, was located on the pier and, when in use, provided an extension of the floor to the upper level of the pier. As the opinion points out (at page 454): "No vessel was connected with the accident."

In each of the third-party actions (Weyerhaeuser v. Nacirema), the court made findings in substance as follows:

1. Weyerhaeuser and Nacirema entered into a written contract (Exhibit D–15), whereby Nacirema agreed to perform the stevedoring services required by Weyerhaeuser in the loading of the vessel.

2. Weyerhaeuser, in the circumstances which existed at the time of the accident, used reasonable care in keeping the vessel secured to the dock by its mooring lines.

3. The number and/or the arrangement of the steel beams in the railroad car did not subject the plaintiff to any

unreasonable risk of harm in the break-out of the beams.

4. The "Baltimore dog" furnished and used by Nacirema for the break-out of the steel beams on the day in question was, at and immediately before the time of the use of the "break-out dog", in a defective and unsafe condition in that its horizontal lip was bent downward about 15 degrees, and its vertical 12-inch shaft was bent out of line about 15 degrees.

5. The "Baltimore break-out dog" in the condition in which it was at the time of the accident, as heretofore found, was not a reasonably safe, suitable and proper appliance for the use to which it was then being put.

6. The break-out by Nacirema of six steel H-beams of 10-inch size, by the use of the defective "Baltimore break-out dog", was not an exercise of reasonable care by Nacirema under the circumstances, and in that respect Nacirema was negligent.

7. The injuries to Bernard Litwinowicz and to Joseph Matyas resulted from the use by Nacirema of a defective "Baltimore dog" in breaking-out the steel beams, and from the breaking-out by Nacirema with that defective "dog" of six steel H-beams of 10-inch size.

The court supplemented these findings with an additional finding, as follows:

The trial court finds that six steel H-beams of 10-inch size was a greater number of beams than could be safely and properly broken-out with a "Baltimore dog" that was not in defective condition.

■ The contract between Weyerhaeuser and Nacirema necessarily included an obligation on the latter's part to discharge the duties of its employment in a safe, proper and workmanlike manner. Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp., 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133; Weyerhaeuser Steamship Co. v. Nacirema Operating Co., 1958, 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491. In Ryan supra, it was said (350 U.S. at pages 133–134, 76 S.Ct. at page 237):

"This obligation is not a quasi-contractual obligation implied in law or arising out of a noncontractual relationship. It is of the essence of petitioner's stevedoring contract. It is petitioner's warranty of workmanlike service that is comparable to a manufacturer's warranty of the soundness of its manufactured product. The shipowner's action is not changed from one for a breach of contract to one for a tort simply because recovery may turn upon the standard of the performance of petitioner's stevedoring service."

■■ Our findings establish Nacirema's breach of its warranty of workmanlike service, and the resulting injuries to the plaintiffs. Weyerhaeuser, therefore, is entitled to indemnification for all damages it has sustained as a result of that breach. Crumady v. The Joachim Hendrik Fisser, 1959, 358 U.S. 423, 428, 79 S.Ct. 445, 3 L.Ed.2d 413.

■ Nacirema contends, however, that since the alleged breach of warranty and the resulting injuries to plaintiffs occurred on shore, "Pennsylvania law must be used to interpret the contract so as to determine whether or not there was a breach of this contract with respect to this particular act, and if so, what consequences flow therefrom." We think this contention is unsound. Nacirema admits that a contract for stevedoring services is a maritime contract. The respective rights and duties of the parties, therefore, should be determined by federal, and not state, principles, in accordance with what seems to be the general rule. So much, we think, is implicit in the Ryan, Weyerhaeuser and Crumady cases, supra. The governing considerations are well stated in A/S J. Ludwig Mowinckels Rederi v. Commercial Stevedoring Co., 2 Cir., 1958, 256 F. 2d 227, 229.

"The provision in Art. III, § 2, of the Constitution extending the judicial power of the United States to 'all Cases of admiralty and maritime Jurisdiction', although silent as

to the substantive law to be applied, has resulted in the application of a large body of general (or federal) maritime law, much of which has been created by federal courts sitting in admiralty. Where states have sought to enter the field by statute their efforts usually have been thwarted as infringements of a field reserved to Congress and the federal courts by the Constitution and as interferences with the uniformity requirements of the maritime law (citing authorities). And in the field of maritime contracts generally, the cases are clear that in most situations federal, and not state, principles apply to determine the respective rights and duties of the parties. In fact the Supreme Court only recently discussed the implied promise of a stevedore to indemnify a shipowner for foreseeable damages resulting from the stevedore's breach of its implied warranty of workmanlike performance, Ryan Stevedoring Co. v. Pan-Atlantic Steam Ship Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133; Weyerhaeuser Steamship Co. v. Nacirema Operating Co., 355 U.S. 563, 78 S. Ct. 438, 2 L.Ed.2d 491, and made no mention of state rules which either create or condition this liability. Obviously, therefore, the Court considered that these problems are governed solely by federal maritime principles."

Wilburn Boat Co. v. Fireman's Fund Ins. Co., 1955, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337, greatly relied upon by Nacirema, is limited by its own peculiar facts, and decided only that there was no rule of federal origin or application defining the effect of warranties in marine insurance policies, and that in the absence of such rule, the court would give effect to a state statute.[5]

It may be added that even were the contract construed in accordance with Pennsylvania law, the result might well be the same as under the maritime law. While we find no Pennsylvania case directly in point, Builders Supply Company v. McCabe, 366 Pa. 322, 77 A.2d 368, 24 A.L.R.2d 319, provides an excellent discussion and review of the cases on indemnity generally, and the distinction between indemnity and contribution. We emphasize to Nacirema that the question before us is one of indemnity, and not one of contribution between joint tortfeasors. Maio v. Fahs, 339 Pa. 180, 14 A.2d 105, and similar cases, are therefore not in point.

██ The jury found, in answer to question 2a, that Weyerhaeuser, in the circumstances which existed at the time of the accident, used reasonable care in keeping the vessel secured to the dock by its mooring lines. The court made a similar finding, as already noted, in the third-party actions.

Nacirema asks us to amend that finding to state that Weyerhaeuser did not, in the circumstances which existed at the time of the accident, use reasonable care in keeping the vessel secured to the dock by its mooring lines. Nacirema also asks to to make as an additional finding of fact the following: "The lack of reasonable care by Weyerhaeuser in keeping the vessel secured to the dock by its mooring lines was a substantial factor in causing plaintiffs' injuries."

The evidence on this point was in direct and irreconcilable conflict. Plaintiffs' witness Okavage, who operated the break-out winch at the time of the accident, testified that the vessel moved in toward and away from the pier a distance of 2 or 3 feet. Another witness for plaintiffs, Somensky, corroborated this, and also stated that, in addition, the ship moved 4 or 5 feet forward and backward. He stated that at the time of the accident, "The ship breasted in to the pier." A third witness, Collins, who was hatch tender at the time of the occurrence—called by plaintiffs and later by defendant—testified that before the accident "she was breasting in, about two feet and

5. See the excellent comment on this case in A/S J. Ludwig, supra, 256 F.2d at page 230.

out, in and away from the pier," but that there was no movement of the ship at the moment of the accident. The witness, Somensky, speaking of the mooring lines, stated: "Well, I seen them very slack, and then they would tighten up, and then slacken again."

Plaintiffs produced an expert witness who testified that, assuming the vessel moved as described by these witnesses, it was not properly secured to the dock. He stated, in answer to a hypothetical question, that there were not sufficient mooring lines out on the bow of the vessel. He stated that the action of the tides and the loading of the vessel, with consequent changes in the vessel's elevation in relation to the pier, would cause the mooring lines to slacken or to tighten, and that due care required inspection of the lines at intervals and the making of necessary adjustments. The witness testified that any movement of the vessel would necessarily be transmitted to the draft of beams causing the end of the draft not raised to bind against the adjoining tiers of beams in the car, and that as the draft was lowered onto the chocks it "could not necessarily fall as fast as the dog was lowered away, and that fractional part of a second that it hung up before it finally did go from its own weight is my opinion when that dog slipped out."

On the other hand, there was abundant testimony that the vessel was properly moored, and that there was no movement whatsoever at the time of the accident or at any other time. The master of the ship so testified, as did the pilot who brought the ship in and did the original mooring. The relief mate on duty at the time of the occurrence stated that he inspected the mooring lines and the mooring of the vessel and found them satisfactory; that there was no motion of the ship; that he probably adjusted the lines that evening, and the lines would be slacked because of the incoming tide. The officer of the Coast Guard who investigated the accident stated that he had received no complaints of improper mooring of the ship at the time of the occur-

rence. Plaintiff Matyas testified that he saw no movement of the ship at the time in question.

The evidence on this issue was voluminous and no purpose would be served by reviewing it in greater detail. Enough has been said to indicate that the question was one for the finders of fact, and their conclusion was clearly not opposed to the weight of the evidence.

In support of its motions for a new trial, Weyerhaeuser urges that the evidence convicted both plaintiffs of contributory negligence, and that the jury's answers to the contrary were against the weight of the evidence. Nacirema makes a similar contention, and requests that we make findings accordingly. Our review of the evidence persuades us that the contention is without merit.

It appears in the evidence that the beams were about centered lengthwise in the railroad car, leaving an open space of 6 or 7 feet between either end of the beams and the end of the car. Plaintiffs' witness Collins testified that if plaintiffs had gone down into either of these end spaces after placing their chocks under the draft, neither of them would have been struck by the falling beams. From this it is argued that plaintiffs, in the exercise of due care for their own safety, should have taken such precautions, and that their failure to do so constituted contributory negligence. Collins also testified, however, that plaintiffs had to be on "top of the steel" to place their chocks under the draft, and to put the "bridles" on it for hoisting it into the vessel after the steel was lowered onto the chocks. Moreover, Matyas testified, without contradiction, that he had to guide the draft as it came down onto the chocks "and then wrap the wire up". Asked by the court why he did not go down into the end of the car after placing his chock, Matyas stated: " * * * when I placed my chock just at that time, I just about straightened up to go to the side of the car when the hook (dog) slipped. I didn't have the chance to go." Several witnesses testified that it was the uniform practice to remain on top of the

beams during the operation because of the time element involved.

There was uncontradicted testimony, too, that both plaintiffs stepped to the side of the car after placing their chocks. The jury might well conclude that, in the existing circumstances, plaintiffs took every rational and practicable measure to insure their own safety, and fully complied with the duty of due care. The jury might reasonably find that plaintiffs could not have anticipated or foreseen that a defective "dog" would cast the beams on them, and could not therefore have realized the peril in their position. The risk reasonably to be perceived defines the duty to be obeyed. Dahlstrom v. Shrum, 368 Pa. 423, 425, 84 A.2d 289.

Finally, Weyerhaeuser contends that the amount of damages assessed by the jury in favor of the plaintiffs was excessive, and moves the court for a new trial in each case on that issue.

In the course of the oral argument, counsel for Weyerhaeuser stated that it would be "difficult" for him to ask us to say that the verdict in favor of Litwinowicz was so excessive as to shock our conscience. This verdict ($65,000) may, under the evidence, be liberal, but we do not find it excessive. The motion, in this case, will therefore be denied.

▮▮ The verdict in favor of Matyas has been the subject of our serious consideration and concern. Matyas was struck as he was attempting to escape over the side of the freight car. The falling beams pinned his right leg against the side of the car, and three fingers were caught under the steel. Following the accident he was taken to a hospital, where it was found that he had sustained a fracture of the tibia and fibula in relation to the ankle joint. He was taken home after four days in the hospital.

Matyas was a patient at another hospital from July 2 until July 27, (1956), where he was attended by Dr. Friedenberg, who also saw him on several subsequent visits as an outpatient. Plaintiff was in a third hospital for about a month in 1957.

There can be no doubt, under the evidence, that plaintiff suffered severe and painful injuries as a result of the accident. His injured member was confined in a cast for many months. He was unable to get about except with the aid of crutches until December 1956, when he began to use a cane. However, the medical testimony, on both sides, indicates a strong propensity on this plaintiff's part to exaggerate his injuries, and a marked disinclination to cooperate in efforts looking towards his rehabilitation.

Plaintiff produced Dr. Friedenberg at the trial. He stated that plaintiff's fracture was fully healed in November 1956. He noted at that time, however, that "the patient has shown a very unsatisfactory response to therapy as far as rehabilitating him"; that the patient had been "very difficult to handle in his last two or three visits, as I am trying to make him more independent in walking but he seems to insist in depending upon his crutches."

Dr. Friedenberg last saw plaintiff on December 26, 1956, at which time plaintiff was somewhat improved, able to walk without crutches, but showed a "very poor" limp on the right side. A very complete examination showed a residual swelling of a mild degree referable to the right lower extremity, and a moderate restriction of ankle range in the nature of 10 to 15 degrees in "planta flexion". A note made by the witness at that time states:

"I feel that this patient is at the present time fully recovered from the effects of his fracture, but that he is suffering from the effects of overweight, poor muscle tone. I also think that he has not made any strong effort to condition himself to return to work. He continues to have a variety of complaints referable to both hips, the back, the upper extremities and shoulders which are not directly referable to his injury."

Defendant called Dr. Ornsteen, who stated that he had examined Matyas in June 1957, and October 1957, as a consultant in connection with treatment

which plaintiff was then undergoing, and that on these occasions he found an element of "conscious exaggeration" on plaintiff's part. Testifying as plaintiff's own witness, Dr. Ornsteen stated that his examinations of plaintiff disclosed a 50 per cent functional disability of the right lower limb. Questioned on cross-examination with respect to the connection between plaintiff's "allegations" and the pending litigation, Dr. Ornsteen testified that "because of his allegations being so bizarre and grossly exaggerated and not in keeping with the findings in respect of the time element from the date of the injury until I examined him, these to me indicated gross exaggeration. And when there is no need for acting that way any more there will be no more of that allegation."

Dr. Weldon, called by plaintiff, stated that he treated plaintiff from September 1957, until February 1959, at first in association with Dr. Orr and later alone. He said that on his first examination he found that the fracture of the ankle had resulted in a complication known as sympathetic muscular dystrophy, characterized by a lessening of the musculature of the leg, changes in the blood supply of that member and some degree of pain; that these complaints persisted from the time of the injury "to the time I saw him and when I last saw him." Dr. Weldon discovered from records that plaintiff had received treatment from other physicians, including Dr. De Palma, who had performed a series of nerve blocks in an effort to determine whether the blood supply to the extremity could be increased, thereby relieving the symptoms. The prior treatment had been unsuccessful, and Dr. Weldon ruled out surgery. Plaintiff was "carried on" tranquillizing agents, that had been prescribed earlier by Dr. Ornsteen. Dr. Weldon stated that it was felt that in association with plaintiff's illness there was a "pattern of exaggeration", and that the amount of pain was "rather exhorbitant". He testified that there is no program available at the present time to restore the proper circulation in plaintiff's limb. In the witness'

opinion, the final result, insofar as the fracture itself was concerned, "is a very good one". He estimated that the permanent disability in plaintiff's right limb would be about 40 per cent, but stated that it is a matter of will on plaintiff's part to overcome "a certain element of this". He was of the opinion that plaintiff would have some difficulty in climbing, and that his main handicap would be a "matter of fatigue". Finally, Dr. Weldon testified: "It boils down to the fact that I believe he should make an effort to do something to go out and work, to do another form of work, and in so— in so doing provide his own therapy. In other words, take his mind off his disability and thereby regain a modicum of use of the extremity".

On January 13, 1959, plaintiff was examined, at defendant's request, by Dr. M. A. Blaker, who testified as defendant's witness. After a recital of the history he had obtained, and a detailed description of his examination of plaintiff, Dr. Blaker stated that he had found nothing to indicate impairment of circulation in the right lower extremity, that plaintiff had equal and palpable pulses on both sides, and that, in his opinion, plaintiff was not suffering from a reflex sympathetic dystrophy at the time of his examination. Dr. Blaker stated that he was of the opinion that the "very extensive and diffuse and bizarre" complaints referable to the right foot and ankle were being exaggerated, since he could find no clinical evidence of dystrophy of the right lower extremity, or of other conditions described by the plaintiff. The witness expressed the opinion that plaintiff was able to work at the time of the examination, although he did not particularize the type of work.

Plaintiff testified that his legs start to shake under him when he walks any distance or even when he stands still, that he gets sharp pains in his leg, and that he has not noticed any improvement in his condition in the last year or so.

It appears that plaintiff was about forty years of age at the time of the acci-

dent. His education included "around" two and a half years in high school, but he has engaged only in freight handling or longshore work. In the three last full years prior to the accident, his gross income averaged about $5,100 per year. Plaintiff has not worked since the accident, for the reason, he explained, that he "can't do any" work.

Whatever the degree of plaintiff's present disability, it is certainly a fair inference from all the testimony that it is the result, in large part, of his failure to cooperate in his own rehabilitation, and thus provide, to the extent possible, his own therapy. Plaintiff was under the duty, as are all plaintiffs, to make an honest and resolute attempt to mitigate the damages.

The jury's assessment of damages ($75,000) seems to us unwarranted under the evidence. During the trial, unable fully to control his emotions, Matyas, in full sight of the jury, gave vent to tears while testifying and on several other occasions, while medical testimony concerning his injuries was being heard. We are convinced that the amount of the verdict in his favor reflected the influence of the sympathy evoked by those tears and accounted for the fact that the award to him substantially exceeded the award to Litwinowicz who undoubtedly suffered much the more serious injuries. We conclude that this verdict is excessive, and that a new trial should be granted, unless the plaintiff, Matyas, files a remittitur of all sums in excess of $55,000. Accordingly, we enter the following

### Order

Now, December 21, 1959, in Civil Action 21553, it is ordered that the post-trial motions of the defendant, Weyerhaeuser Steamship Company, and of the third-party defendant, Nacirema Operating Co., Inc., are denied.

In Civil Action 21554, it is ordered that the post-trial motions of the defendant, Weyerhaeuser Steamship Company and of the third-party defendant, Nacirema Operating Co., Inc., for a new trial will be granted unless the plaintiff, Joseph

Matyas, on or before January 15, 1960, files a remittitur of all sums in excess of $55,000. The remaining post-trial motions of the said defendant and the said third-party defendant are denied.