**Robert SPANN, Appellant,**

v.

**J. LAURITZEN.**

**No. 14840.**

United States Court of Appeals
Third Circuit.

Argued Oct. 9, 1964.

Decided April 19, 1965.

John Dorfman, Dorfman, Pechner, Sacks & Dorfman, Philadelphia, Pa., for appellant.

John T. Biezup, Rawle & Henderson, Philadelphia, Pa., for appellee.

Before KALODNER, GANEY and FREEDMAN, Circuit Judges.

FREEDMAN, Circuit Judge.

Plaintiff, a longshoreman, was employed by a stevedoring company as a member of a gang engaged in unloading a vessel. He brought suit against its owner to recover for injuries sustained because of the alleged unseaworthiness of the vessel and the negligence of the shipowner. The disposition of the appeal depends on the question of unseaworthiness.

The learned District Judge granted defendant's motion for summary judgment on facts which are undisputed. They are well summarized in his opinion: "At the time of the plaintiff's injury a bulk cargo of nitrate of soda was being discharged by a shore based crane. The crane would lower its bucket into the hold, pick up a load of nitrate, swing it around and drop the nitrate into a hopper on the pier. The hopper, which was owned by Lavino Shipping Company [and was being operated by the stevedoring company], was a piece of equipment, roughly funnel shaped, the opening at the top being 14' x 11'. When full, it held eight buckets of nitrate, each bucket holding 1¼ cubic yards. The hopper stood on the pier and was not attached to the vessel in any way. It rested on supports which raised it sufficiently high above the floor of the pier to allow a truck to drive under it. The empty trucks would move under the hopper, and it was the plaintiff's job to open the floor of the hopper and let the nitrate which had been discharged into it run out and into the truck waiting below to be filled. This he did by pulling down a heavy horizontal bar or handle. Five buckets of nitrate make a truckload. When the truck was filled, he would close the floor so that it would receive and hold the next load of nitrate." (237 F.Supp. 569, 570 (E.D.Pa.1964)).

Plaintiff was injured when a bucket load of nitrate was dropped into the emptied hopper and caused a sudden premature downward movement of the handle, which struck him. He contends that this was caused by a defective release mechanism on the hopper.

Ever since the Supreme Court in Seas Shipping Co., Inc. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), extended the protection of the seaworthiness doctrine to longshoremen engaged in the service of the vessel, subordinate federal courts have encountered difficulty in drawing the line where maritime jurisdiction ends, and in some instances have expressed misgiving at the scope which the Supreme Court has given it in subsequent cases. See e. g., Rogers v. United States Lines, 205 F.2d 57 (3 Cir. 1953); Forkin v. Furness Withy & Co., 323 F.2d 638 (2 Cir. 1963); Reid v. Quebec Paper Sales & Transportation Co., 340 F.2d 34 (2 Cir. 1965), dissenting opinion of Friendly, J. The Supreme Court, however, has repeatedly rejected efforts to distinguish or limit the broad range of its protection. Recently, in Reed v. The Yaka, 373 U.S. 410, 413, 83 S.Ct. 1349, 1352, 10 L.Ed.2d 448 (1963), the Court summed up the policy underlying the view it had expressed in prior cases: "[In] Seas Shipping Co. v. Sieracki * * * we noted particularly the hazards of marine service, the helplessness of the men to ward off the perils of unseaworthiness, the harshness of forcing them to shoulder their losses alone, and the broad range of the 'humanitarian policy' of the doctrine of seaworthiness, which we held not to depend upon any kind of contract. * * * We further held that the Longshoremen's and Harbor Workers' Act was not intended to take away from longshoremen the traditional remedies of the sea, so that recovery for unseaworthiness could be had notwithstanding the availability of compensation." In effectuating its policy the Court has held that it is not material that the longshoreman was injured on land (Gutierrez v. Waterman SS. Corp., 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963)), or that the defective equipment was owned and supplied by the stevedore

(Alaska SS. Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954); Rogers v. United States Lines, 347 U.S. 984, 74 S.Ct. 849, 98 L.Ed. 1120 (1954)), or that an unseaworthy condition created by the stevedore was transient and the shipowner had neither actual nor constructive knowledge of it. Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 549, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960). In the Reed case, supra, a longshoreman was allowed to recover from the shipowner for unseaworthiness due to a defect in wooden pallets which were used in loading the ship, even though the shipowner was also the stevedoring company which hired the longshoreman. The same concern for the welfare of longshoremen is at the foundation of the Supreme Court's decisions which have held the shipowner entitled to indemnity from the stevedoring company. Thus, in Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co., Inc., 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964), a shipowner, which had been held liable for unseaworthiness was permitted to recover indemnity from a stevedoring company, which employed the injured longshoreman, for breach of the implied warranty of workmanlike service even though there was no negligence by the stevedore.

We have sought to effectuate these views of the Court. See, e. g., Ferrante v. Swedish American Lines, 331 F.2d 571 (3 Cir. 1964); Thompson v. Calmar Steamship Corporation, 331 F.2d 657 (3 Cir. 1964), cert. denied 379 U.S. 913, 85 S.Ct. 259, 13 L.Ed.2d 184.

It is in this context that we must answer the two questions presented by this appeal: (1) was plaintiff engaged in the service of the vessel, and (2) does a large shore based hopper have sufficient connection with the ship to be within the subject matter of the warranty of seaworthiness.

(1) The Court below held in effect that since the cargo was removed from the vessel by a large crane over which the owner of the vessel had no control, and the cargo was then dropped into a hopper designed to facilitate the loading of trucks and not in some storage place to be picked up by the consignee, the longshoreman who attended to the opening and closing of the hopper was engaged in loading the trucks and not in unloading the cargo.

■■ This is, of course, a close case. But since the hopper held only eight bucket loads of nitrate it is clear that the hopper had to be emptied repeatedly in order to make room for the crane to dump the subsequent bucket loads which it dug out of the vessel. Clearly the maritime jurisdiction extended to the act of reaching into the vessel and removing cargo. Such removal, having a beginning, had to have an end. If the cargo had been delivered on a second story of the pier, as the court below suggested, the longshoreman injured in the course of the crane's reaching into the vessel, removing bucket loads and dumping them on to the second floor of the pier, would have been within the protection of the maritime jurisdiction. He is no less so because modern ingenuity suggested the desirability of combining the unloading of the vessel with the loading of the trucks. It has frequently been said that the doctrine of unseaworthiness is not to be rigidly construed so as to exclude from its scope modern labor saving methods and the use of modern machinery to do the work traditionally done in loading or unloading vessels. Huff v. Matson Navigation Company, 338 F.2d 205 (9 Cir. 1964); Rodriguez v. Coastal Ship Corporation, 210 F.Supp. 38 (S.D.N.Y. 1962). The labor saving method here used which facilitated the removal of the cargo by motor vehicles may not be held to eliminate the unloading of the cargo from the area of traditional work of the seamen in the service of the vessel.

That the completion of the unloading of a vessel is within the traditional work of the seaman is illustrated in a number of our cases. In Hagans v. Ellerman & Bucknall Steamship Company, 318 F.2d 563 (3 Cir. 1963), plaintiff was a member of a twenty-two man gang engaged in unloading a cargo of sand from a ship. After the bags of sand were discharged

from the ship they were loaded onto four-wheeled flat cars and towed to a pierside warehouse for temporary storage. Plaintiff was removing the bags from the flat cars and piling them on the warehouse floor when he slipped on sand which had escaped from the bags. Notwithstanding defendant's claim that plaintiff was merely stacking the bags for transshipment we held as a matter of law that plaintiff's work was in the service of the ship: "They were the same bags handled by his fellow longshoremen who had started the process of discharge of the cargo in the hold of the vessel. The pier apron could not contain the large number of bags which, in any event, had to be protected from the weather, by being placed within the pier building. The conclusion is inescapable that Hagans performed an integral part of the unloading of the vessel and thus as a matter of law he was in the ship's service." (p. 571).

In Thompson v. Calmar Steamship Corporation, 331 F.2d 657 (1964), we sustained recovery by a plaintiff longshoreman who was injured while engaged in the movement of freight cars which were propelled by the ship's line into a position where their cargo could be loaded onto the ship. The opinion of the District Court in that case shows the vigorous contention made and rejected, that it would be incongruous to construe work on a loaded freight car to be in the service of the ship: "It will not do to isolate from the over-all circumstances the fact that the plaintiff happened to be on a loaded freight car and then plead the seemingly strange extravagance that a workman on a freight car is held to be engaged in the traditional work of a seaman. In isolation such a plea may sound appealing. In the circumstances it is unfounded. Plaintiff was not a member of a railroad crew which brought a railroad freight car on to the pier. He was, on the contrary, a member of a longshoremen's gang engaged in loading a vessel, and in the course of doing so it fell to him to participate in an operation

on land, but one intimately a part of the use of the ship's equipment, i. e. the bull winch and the bull line." (216 F.Supp. 234, 238 (E.D.Pa.1963)). In Litwinowicz v. Weyerhaeuser Steamship Company, 179 F.Supp. 812, 817–818 (E.D.Pa. 1959), plaintiff was injured while working in a railroad car placing wooden "chocks" under a draft of steel beams preparatory to their being hoisted aboard the ship. Rejecting defendant's claim that plaintiff was merely preparing the cargo for loading and not doing the actual loading, Kraft, J., well said: "The term loading is not a word of art, and is not to be narrowly and hypertechnically interpreted. Plaintiffs' actions at the time of the accident were direct, necessary steps in the physical transfer of the steel from the railroad car into the vessel, which constituted the work of loading."

In the light of these decisions it is clear that plaintiff was engaged in unloading the ship.

(2) It has long been held that the warranty of seaworthiness extends not only to the vessel itself in its hull, gear and stowage, but also to its appurtenant appliances and equipment. Mahnich v. Southern Steamship Co., 321 U.S. 96, 99, 64 S.Ct. 455, 88 L.Ed. 561 (1944); Gutierrez v. Waterman Steamship Corp., 373 U.S. 206, 213, 83 S.Ct. 1185, 10 L. Ed.2d 297 (1963). Since the purpose of the doctrine is to protect those in the service of the vessel, the question whether a particular case falls within the scope of the warranty of seaworthiness is answered by determining whether the risk incurred falls within the hazard of the service. As said in Sieracki: "[Liability for unseaworthiness] is essentially a species of liability without fault * * *. Derived from and shaped to meet the hazards which performing the service imposes, the liability is neither limited by conceptions of negligence nor contractual in character. * * * It is a form of absolute duty owing to all within the range of its humanitarian policy."

"On principle * * * this policy is not confined to seamen who perform the ship's service under immediate hire to the owner, but extends to those who render it with his consent or by his arrangement. All the considerations which gave birth to the liability and have shaped its absolute character dictate that the owner should not be free to nullify it by parcelling out his operations to intermediary employers whose sole business is to take over portions of the ship's work or by other devices which would strip the men performing its service of their historic protection." (328 U.S. pp. 94–95, 66 S.Ct. p. 877, 90 L.Ed. 1099).

■ Accordingly the Court has rejected the claim that the shipowner is not responsible for defects in equipment because it was owned and operated by the stevedore rather than the shipowner and was only temporarily aboard the vessel. Alaska Steamship Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954); Rogers v. United States Lines, 347 U.S. 984, 74 S.Ct. 849 (1954). In Sieracki, Petterson and Rogers the injuries were sustained aboard the vessel by the use of equipment connected to it. Recently in Gutierrez the Court expressly held "that the duty to provide a seaworthy ship and gear, including cargo containers, applies to longshoremen unloading the ship whether they are standing aboard ship or on the pier." [1] (373 U.S. p. 215, 83 S.Ct. p. 1191).

The present case deals with a variant in the factual combinations hitherto considered. The equipment was not on the vessel and neither was the longshoreman at the time of his injury. But he was engaged in the actual work of unloading the cargo from the vessel and he was using equipment which was essential for this purpose. Some of the cases, im-

pressed with the size and nature of modern equipment used for the loading and unloading of cargo, have recoiled from declaring it appurtenant to the ship. Thus it has been said that the coverage of the warranty is limited to equipment commonly found among the ship's gear or at least temporarily adopted by the ship. McKnight v. N. M. Paterson & Sons, Ltd., 181 F.Supp. 434 (D.C.Ohio 1960), aff'd. 286 F.2d 250 (6 Cir. 1960), cert. denied 368 U.S. 913, 82 S.Ct. 189, 7 L.Ed. 2d 130 (1961); Forkin v. Furness Withy & Co., 323 F.2d 638 (2 Cir. 1963).[2] In McKnight it was held that the shipowner's obligation did not extend to a shore based crane which was loading stevedoring tools into the hold of the ship. Attempting to distinguish the Supreme Court cases the District Court there said: "In the instant situation it cannot be seriously contended that the crane used in the unloading operation is equipment commonly found among the ship's gear. Both its size and sole function rebel against any argument that a ship might 'adopt' or 'integrate' such equipment as part of its gear. * * * The crane never became physically attached to the ship in any manner, nor did it at any time during the unloading process touch any part of the vessel. * * * The vessel owner had no control over the choice of the crane, and no authority in the direction of its use." (181 F.Supp. at 439). Similarly in Forkin the shipowner was absolved from liability where the injury was due to a defect in a rope being used to move a conveyor belt into position to load the ship. The court distinguished Rogers and Petterson as cases where "the defective gear had been brought on board ship by the stevedores and used integrally with the ship's own equipment; the shipowner could have

1. Similarly, Thompson v. Calmar Steamship Corporation, 331 F.2d 657 (3 Cir. 1964), cert. denied, 379 U.S. 913, 85 S.Ct. 259; Hagans v. Ellerman & Bucknall Steamship Company, 318 F.2d 563 (3 Cir. 1963).

2. Fredericks v. American Export Lines, 227 F.2d 450 (2 Cir. 1955), relied on below, was a suit not against the shipowner but the lessee in possession of the pier, and the brief reference to unseaworthiness at the end of the opinion (p. 454) appears to be an intruding observation readily distinguishable from the decision.

inspected the gear when it came aboard if he had chosen to do so." (323 F.2d p. 641). The Court deemed it important that the shipowner have the power of inspection, and this would arise only when the conveyor was affixed to the ship.

The artificiality of the distinctions suggested in these two cases was well analyzed by the Ninth Circuit in Huff v. Matson Navigation Company, 338 F.2d 205 (9 Cir. 1965), cert. denied, 85 S.Ct. 1026. There a longshoreman was injured in the hold of a vessel by a scraper which was part of the stevedore's dockside crane. None of the ship's gear was involved in any way in the unloading process and the shipowner had no control over the choice of the crane or the manner of its use. Faced with the claim that a shore based crane could not be considered traditional ship's equipment, the Court first referred to the holding of Sieracki that the shipowner's obligations cannot be avoided by a "more modern division of labor" and then noted: "In like manner it seems to us that the well established rule that the shipowner is absolutely liable for the results of defects in unloading equipment brought on board ship by the stevedoring company should not be qualified or modified if the unloading equipment thus used happens to be newly designed and devised and involves none of the traditional unloading gear of the ship. Use of more modern equipment can no more exculpate the shipowner from his obligations than could the use of 'more modern divisions of labor.'" (338 F.2d pp. 212–213). See also Rodriguez v. Coastal Ship Corporation, 210 F.Supp. 38 (S.D.N.Y.1962).

The emphasis in Forkin on the shipowner's opportunity to inspect as essential to his liability injects into unseaworthiness an element based on negligence, contrary to the repeated holdings of the Supreme Court that liability for unseaworthiness is unlimited by conceptions of negligence. In Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 549–550, 80 S.Ct. 926, 932–933, 4 L.Ed.2d 941 (1960), the Court summed up the modern view after citing a number of earlier cases: "[T]he decisions of this Court have undeviatingly reflected an understanding that the owner's duty to furnish a seaworthy ship is absolute and completely independent of his duty under the Jones Act to exercise reasonable care. * * * [T]he shipowner's actual or constructive knowledge of the unseaworthy condition is not essential to his liability. * * * What has evolved is a complete divorcement of unseaworthiness liability from concepts of negligence. To hold otherwise now would be to erase more than just a page of history."

We agree with the Ninth Circuit in the Huff case that McKnight and Forkin are out of harmony with the principles announced by the Supreme Court.

In the Huff case the scraper device reached into the vessel itself and even in some manner was attached to the sides of the hold for purposes of convenience. The Court therefore could have planted its decision on this ground, but it refused to do so, saying: "We do not care to perpetuate any such distinction. We base our refusal to treat the Forkin case as on authority upon the broader ground that the basic theory there applied is manifestly wrong and contrary to the controlling decisions * * *." (338 F.2d p. 215). In the present case the hopper, no less than the crane, was an instrumentality in the unloading of the cargo; it was an essential part of the unloading process. Without its use as a receptacle to be filled and emptied by the injured plaintiff the cargo could not have been unloaded from the vessel. That some other method might have been used does not eliminate the means used for the unloading of the cargo as a part of the appurtenances to the vessel.

The judgment will be reversed.