Aaron **DANIEL**

v.

**SKIBS A/S HILDA KNUDSEN, Christian Haaland and Boise-Griffin Steamship Company, Inc.**

**Civ. A. No. 30778.**

United States District Court
E. D. Pennsylvania.

April 28, 1966.

As the railroad cars, which were owned by MacAndrews & Forbes, were filled they were pulled on the tracks by an engine, also owned by MacAndrews & Forbes, to a warehouse situated on shore at the end of the pier. The operator of the engine was a MacAndrews & Forbes employe. Thereafter, the movement of the bales was done by employes of Murphy Cook under contract with MacAndrews & Forbes.

Upon reaching the warehouse, the bales were unloaded by fork lift trucks to the floor of the warehouse from where they were stacked. In order to raise the bales for stacking the men in the warehouse used a procedure in which a pulley or block is hung to a rafter by what has been termed a "hanger rope." A line fed through the pulley has a set of tongs attached to one end while the other is wound around a "hold and turn motor." Daniel's job was to hook on the tongs (similar to ice tongs) to the draft and signal the operator of the motor to raise the draft so that other Murphy men working on the piles of bales could stack them. Daniel was injured when the hanger rope broke, causing the block to fall and strike Daniel in the chest. The hanger rope was owned by MacAndrews & Forbes but it had been given to Murphy's men who spliced the rope for use in this operation. The block or pulley used was owned by Murphy Cook.

Licorice is a perishable commodity, subject to damage by rain and it was therefore necessary to have it under cover. The pier was inadequate to contain the bales as they were unloaded, and, in addition, there would not have been enough room for them in the warehouse unless they were stacked.

Murphy Cook had agreed with MacAndrews & Forbes to supply the longshoremen who worked on the ship and on the landing stages immediately adjacent to the ship, and also the men working in the warehouse. As to the former, the ship had agreed with MacAndrews & Forbes to make an allowance against the freight bill for the costs which MacAndrews & Forbes incurred to Murphy

Klovsky, Kuby & Harris, by Benjamin Kuby, Philadelphia, Pa., for plaintiff.

Krusen, Evans & Byrne, by Timothy J. Mahoney, Philadelphia, Pa., for defendants.

JOSEPH S. LORD, III, District Judge.

On September 29, 1961, the SS "Concordia Fonn", carrying a cargo of baled licorice consigned to MacAndrews & Forbes, was being unloaded at the MacAndrews & Forbes pier in Camden, N. J. The unloading procedure was as follows:

Two twenty-two man gangs of longshoremen, employed by the stevedoring firm of Murphy Cook Co., brought the cargo from the hold of the vessel over the side to a landing stage. From there, the bales of licorice were loaded on railroad flat cars which were on tracks on the pier. Each bale weighed about 350 pounds and about 200 bales per hour were discharged from each of the two holds.

Cook. No such allowance was made for the men working in the warehouse, and defendant had nothing to do with that arrangement.

Plaintiff's suit against the vessel is based solely on an asserted breach of the warranty of seaworthiness which plaintiff claims extends to him. We left it to the jury to determine whether plaintiff was engaged in unloading the vessel and hence covered by the warranty. The jury found for the plaintiff in the amount of $10,000. Defendant has moved for judgment notwithstanding the verdict, or in the alternative, for a new trial.

### I.

■ This case presents the problem of whether the already broad coverage of the warranty of seaworthiness should be further extended. It can no longer be questioned, of course, that a longshoreman engaged in the service of the vessel is entitled to the benefits of the warranty. Seas Shipping Co., Inc. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). However, this broad statement of the rule is but a starting point for the solution of particular cases. Lurking within it are unexplored areas of liability or non-liability whose borders are difficult of exact discernment. The best starting place is at the beginning, i. e., the basis of the warranty of seaworthiness. In Reed v. Steamship Yaka etc., et al., 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963), the Court referred to the holding in *Sieracki* which extended the warranty to longshoremen and said at page 413, 83 S.Ct. at page 1352:

> " * * * In doing so, we noted particularly the hazards of marine service, the helplessness of the men to ward off the perils of unseaworthiness, the harshness of forcing them to shoulder their losses alone, and the broad range of the 'humanitarian policy' of the doctrine of seaworthiness, which we held not to depend upon any kind of contract. * * * "

Thus, it would appear that originally the warranty evolved because of the peculiar differences between shore work and sea work, it being thought that the hazards involved in the two were different and hence required different modes of protection. The longshoreman, so long as he is doing ship's work, has now become the beneficiary of the doctrine originally devised for the protection of his seagoing brothers.

It has been frequently stated that the work of unloading is ship's work, traditionally performed by members of the crew, and that a longshoreman engaged in unloading is entitled to the benefit of the warranty. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946); Crumady v. "Joachim Hendrik Fisser," 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959). The longshoreman who is working in the hold hooking on to cargo, or the longshoremen working on deck guiding it or operating the cargo winches pose no real problem. Nor is there any longer a problem where a longshoreman, a member of the same gang working aboard the ship, is incidentally on shore doing a job that is part of an unbroken sequence of getting the cargo from ship to shore.

Plaintiff argues that because of the large number of bales of licorice unloaded per hour in relation to the small capacity of the pier, the perishable nature of the cargo, the necessity of removing the cargo to a covered repository, and the need to stack the bales in that repository, plaintiff was participating in the unloading of the ship. We think, however, that merely to characterize uncritically plaintiff's work as part of "unloading" and therefore to hold that he must be covered by the warranty misses the boat. To so hold would be to impose a semantic liability, and the logic of words must give way to the logic of reality. It is necessary to examine what part plaintiff's work played in the unloading process. In Crumady v. "Joachim Hendrik Fisser", 358 U.S. 423, at page 426, 79 S.Ct. 445, at page 447 (1959), the Court said:

> "We held in Seas Shipping Co. v. Sieracki, 328 U.S. 85, 95, 66 S.Ct.

872, 877, 90 L.Ed. 1099, 1106, that stevedores, though intermediately employed, are, when performing 'the ship's service,' entitled to the same protection against unseaworthiness which members of the crew doing the same work would receive. And see Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143. The work of loading and unloading is historically 'the work of the ship's service.' Seas Shipping Co. v. Sieracki, supra, (328 U.S. at 96, 66 S.Ct. 872, at page 878). * * *"

It is possible to conceive of an almost limitless variety of situations in which a worker may make some contribution to the discharge of the vessel, and yet not be considered as doing the ship's work. Thus, if the pier area adjacent to the vessel were inadequate to contain the cargo and the consignee engaged a trucker to haul it away, the trucker would be contributing to the completion of the unloading process. However, we cannot believe that he would be held covered by the seaworthiness warranty. Again, if the cargo were taken from the hold of the vessel and placed in railroad cars, which, in turn were pulled away by a railroad crew, we think the warranty would not extend to the railroaders. In Thompson v. Calmar Steamship Corporation, 216 F.Supp. 234 (E.D.Pa.1963), aff'd 331 F.2d 657 (C.A.3, 1964), Judge (now Circuit Judge) Freedman said, at page 238:

" * * * Plaintiff was not a member of a railroad crew which brought a railroad freight car on to the pier. He was, on the contrary, a member of a longshoremen's gang engaged in loading a vessel, and in the course of doing so it fell to him to participate in an operation on land, but one intimately a part of the use of the ship's equipment, i. e. the bull winch and the bull line. * * *"

Similarly, in Hagans v. Ellerman & Bucknall Steamship Company, 318 F.2d 563 (C.A.3, 1963), plaintiff was a member of the twenty-two man longshore gang which was "working the ship,". i. e., taking the cargo from the hold. Again, it fell to plaintiff to participate in an operation on land,—pushing the trucks into which the cargo had been loaded from the ship to a covered portion of the pier. Plaintiff was held covered by the warranty. In Spann v. Lauritzen, 344 F.2d 204 (C.A.3, 1965), cert. denied, 382 U.S. 938, 86 S.Ct. 386, 15 L.Ed.2d 348 (1965), a cargo of nitrate was being unloaded. It was taken from the hold and dumped into a shore-side hopper. Plaintiff again was a member of the unloading crew and his job was to operate the hopper. He was injured as a result of a defective handle. Recovery for unseaworthiness was permitted.

Running throughout the cases[1] permitting recovery for land-suffered injuries are common themes:

(1) The plaintiff was a member of the actual unloading gang whose duties, as a part of the work that his gang was doing, incidentally took him ashore. Here, however, plaintiff was not a member of the longshore gang. It is true that the test of coverage is status, not situs. Di Salvo v. Cunard Steamship Co., Ltd., 171 F.Supp. 813 (S.D.N.Y.1959). Plaintiff's status here is no different from that of any shore based worker handling what was at one time ship's cargo. He is one and the same as the railroader referred to in *Thompson* as distinguishable from the members of the longshore gang.

(2) The sequence of movement was unbroken by any act of the consignee. Here, however, the cargo had left the

1. Gutierrez v. Waterman Steamship Corp., 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963); Hagans v. Ellerman & Bucknall Steamship Company, 318 F.2d 563 (C.A.3, 1963); Thompson v. Calmar Steamship Company, 331 F.2d 657 (C.A.3, 1964); Huff v. Matson Navigation Company, 338 F.2d 205 (C.A.9, 1964); Spann v. Lauritzen, 344 F.2d 204 (C.A.3, 1965); Litwinowicz v. Weyerhaeuser Steamship Company, 179 F.Supp. 812 (E. D.Pa., 1959).

hands of the ship and of those to whom the ship had delegated its work of unloading, the longshoremen. The licorice had become the responsibility of the consignee. Calcot, Ltd. v. Isbrandtsen Company, 318 F.2d 669 (C.A.1, 1963). The bales of licorice were taken from the hold, were placed on flat cars owned by the consignee, pulled by an engine owned by the consignee and operated by the consignee's employe. When they arrived at the warehouse, they were unloaded by employes of Murphy Cook through an agreement between Murphy Cook and the consignee. In *Spann,* the situation was far different. The operation of removing the nitrate from the hold, dumping it into the hopper and thence into the trucks was a continued, uninterrupted sequence. The consignee in no way participated. So, too, in *Hagans* there was no intervention of the consignee between the departure of the bags of sand from the hold and their arrival in the warehouse.

These differences, we think, are critical. While plaintiff's work may have contributed to the unloading process in a philosophical sense, it was not unloading in the sense that it was a part of the ship's work. We are aware that the recent trend of decisions in this Circuit and in the Supreme Court has been to widen the ambit of seaworthiness coverage. However, there has to be an end somewhere of the unloading process in the sense of liability-imposing ship's work. "Clearly the maritime jurisdiction extended to the act of reaching into the vessel and removing cargo. Such removal, having a beginning, had to have an end." Spann v. Lauritzen, 344 F.2d 204, 206 (C.A.3, 1965). The plain implication of *Spann* is that the unloading ended at the hopper, including the emptying of the hopper so that its part in the unloading process could continue. Whether or not the driver of the truck that received the nitrate would be covered, plaintiff's work here was even further removed. We think the removal,

or unloading, ended with the delivery of the cargo to the consignee.

There are other reasons for our conclusion.

(1) As pointed out above, the basis for the development of the warranty was to protect against maritime hazards those persons exposed to such hazards who are unable to protect themselves from the perils involved. The plaintiff here was completely shore-based. His work was ashore and he had no contact, remote or otherwise, with the ship. There is no more need for the development of a protective shield for those in plaintiff's then occupation than there is for those engaged in any other industrial occupation. Plaintiff was subject to no particular maritime hazard, nor indeed, to any hazard that the ordinary warehouse worker would not encounter.

(2) The basis for the extension of the warranty to longshoremen seems to be that the vessel owner cannot escape liability by hiring others to do its work and that it is immaterial that the owner seeks to have its work done by a more modern division of labor. "Historically the work of loading and unloading is the work of the ship's service, performed until recent times by members of the crew * * *. That *the owner*[2] seeks to have it done with the advantages of more modern divisions of labor does not minimize the worker's hazard and should not nullify his protection." Seas Shipping Co., Inc. v. Sieracki, 328 U.S. 85, 96, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). "Not *the owner's* consent to liability, but *his* consent to performance of the service defines its boundary." Ibid. The liability "extends to those who render it with *his* consent or by his arrangement." Ibid., at page 95, 66 S.Ct. at page 877. "If *the owner* engages others who supply the equipment necessary for stevedoring operations, he must still answer to the longshoreman if the gear proves to be unseaworthy." Huff v. Matson Navigation Company, 338 F.2d 205 (C.A. 9, 1964).

---

2. Emphasis in this paragraph ours.

The most significant difference between this case and all that have gone before it, so far as our research reveals, is that here the owner did not engage either the stevedore or its employes to do the work being performed by plaintiff, although it did, in effect, engage those actually working the ship. The consignee, with the ship's agreement, engaged Murphy Cook to provide a twenty-two man gang to bring the cargo from the vessel's hold to the pier. However, defendant made an allowance against the freight bill for the cost of this longshore labor. On the other hand, the consignee arranged directly with Murphy Cook for the labor in plaintiff's gang. The ship made no allowance for this cost and had nothing whatsoever to do with the arrangement. The scope of the owner's liability cannot be constricted by delegation of *its* work but here there was no delegation of the ship's work by the ship; the delegation, if any, was by Mac-Andrews & Forbes. *The owner* did not seek to have this work done by others; *the owner* did not seek the advantages of more modern divisions of labor; *the owner* did not engage others; plaintiff was not employed by *the owner's* consent or arrangement. Certainly, to extend the warranty to those with whom the owner had no connection whatsoever would be at least unprecedented, and we think unwarranted.

## II.

In Spann v. Lauritzen, 344 F.2d 204 (C.A.3, 1965), the court directed its attention first to the determination of whether or not plaintiff was engaged in the service of the vessel, concluded that he was, and was therefore entitled to the warranty of seaworthiness. It then became necessary to consider whether he was injured by a defect in an "appurtenance" of the ship, for unseaworthiness only applies to the ship and its appurtenances. The court concluded that the hopper was an appurtenance because "it was an essential part of the unloading process." Ibid., page 209. It seems to us that we do not here need to reach the second inquiry. Having determined that plaintiff was not in the service of the vessel, it follows that he was not covered by the warranty of seaworthiness. In this posture, even if the injury-causing instrumentality was an appurtenance, there would be no liability absent a negligent breach of duty. In short, the character of the rope as an appurtenance is moot.

Defendants' motion for judgment will be granted.