Joseph **CHAGOIS**, Plaintiff-Appellee, Cross-Appellant,

v.

**LYKES BROS. STEAMSHIP COMPANY,** Inc., Defendant-Appellant, Cross-Appellee.

No. 29639

Summary Calendar.*

United States Court of Appeals, Fifth Circuit.

Sept. 30, 1970.

Rehearing Denied Nov. 2, 1970.

* [1] Rule 18, 5th Cir.; See Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al., 5th Cir. 1970, 431 F.2d 409, Part I.

Terriberry, Carroll, Yancey & Farrell, New Orleans, La., Holt & Woodley, Lake Charles, La., for defendant-appellant, cross-appellee; Edmund E. Woodley, Lake Charles, La., of counsel.

Joseph E. Bass, Lake Charles, La., for plaintiff-appellee, cross-appellant.

Before WISDOM, COLEMAN, and SIMPSON, Circuit Judges.

WISDOM, Circuit Judge:

In this case a longshoreman engaged to assist in loading a ship was injured while he was on the pier adjacent to the ship. The injury was allegedly caused by unseaworthy equipment owned and under the control of the stevedoring company. The district court held that the warranty of seaworthiness applied, and gave judgment for the longshoreman against the shipowner. We affirm.

The plaintiff, Joseph Chagois, is a longshoreman employed by Lake Charles Stevedores, Inc. Defendant Lykes Bros. Steamship Company, Inc., is the owner of the SS SUE LYKES. The Supreme Rice Milling Company engaged Stevedores to load bulk rice from railroad boxcars on the pier into the hold of the SS SUE LYKES. Chagois was one member of the "gang" of longshoremen assigned to do the job.

Early on the morning of August 18, 1966, the longshoremen went on board the ship to uncover the hatch and prepare the hold to receive the bulk rice. After cleaning the hold and lining the bottom with polyethylene sheeting to protect the rice, some of the men remained on the vessel to assist in getting the rice into the hold. Others, including Chagois, were directed to work on the pier.

The rice was to be conveyed from the boxcars to the vessel by means of a marine leg or grain elevator Stevedores had constructed as a permanent installation at the pier. The ship was moored alongside the marine leg. The boxcars were brought alongside the hopper of the elevator, and a bridge was extended from the hopper to the boxcar to receive the rice from the bottom of the car when the door was opened. When the boxcar door was opened, some of the loose rice spilled naturally into the hopper. To get all of the rice out of the boxcar and into the hopper, Stevedores employed a screw conveyer or auger.

The auger was twenty-four feet long and was powered by an electric motor. When in operation, the auger rotated rapidly and channeled loose rice toward the car door and into the hopper. One member of the gang was assigned to hold the auger in a stationary position as it rotated. He could do this by grasping a handle, similar to a lawn-mower handle, attached at the far end of the auger. While he held the auger in place, several other men stood in the car and shoveled rice into the revolving screw.

At the time of the accident, the longshoremen were transferring the contents of the third or fourth boxcar into the vessel. Chagois was standing in the loose rice and holding the handle of the auger. As the rice reached a low level in the car, the rotating auger struck the floor of the boxcar. The bouncing auger threw Chagois off balance and caught his leg in its revolving screw.

The district court found that Chagois had never seen or worked with the auger before the day of the accident, that there was no guard or housing surrounding the auger, and that there was no off-on switch at any point on the auger except on the electric motor, which was situated outside of the boxcar on the pier. Moreover, no safety drill or demonstration had ever been given to Chagois or the other men concerning the operation of the auger.

In the circumstances, the court concluded, Stevedores' use of the auger constituted unseaworthiness, and this unseaworthiness was the proximate cause of Chagois's injury. The court awarded Chagois damages in the amount of $80,000.

Lykes appealed to this Court on the ground that the warranty of seaworthiness owed by the shipowner does not extend to a longshoreman injured while

engaging in activities on the shore over which the shipowner has no control or responsibility. Specifically, Lykes contends that Chagois was not loading the ship at the time of his injury and thus was not protected by the seaworthiness doctrine. Chagois has cross-appealed and asks that the award of damages be increased and that interest be allowed from the date of judicial demand. In all respects, we affirm the judgment of the district court.

## I.

At least since the decision of the Supreme Court in Mahnich v. Southern S.S. Co., 1944, 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561, it has been clear that a shipowner is liable for injuries to seamen caused by the unseaworthiness of his ship or its equipment. Shortly thereafter, it became equally clear that the warranty of seaworthiness extends also to longshoremen injured on board ship while working in the service of the ship. Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099. Moreover, as long as the longshoreman is actually working in the services of the ship, it does not matter that his injury occurs on the shore; the shipowner is still liable for any unseaworthiness of his vessel that causes the longshoreman harm. Gutierrez v. Waterman S.S. Corp., 1963, 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297; Thompson v. Calmar S.S. Corp., 3 Cir. 1964, 331 F.2d 657. The warranty of seaworthiness then depends not on plaintiff's status or location but primarily upon the type of work he does and its relationship to the ship. Pope & Talbot v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143. The work of loading and unloading the ship is, without a doubt, work in the ship's service, and any longshoreman injured while loading or unloading a ship may avail himself of the unseaworthiness remedy. Seas Shipping Co. v. Sier-

acki, *supra;* Deffes v. Federal Barge Lines, Inc., 5 Cir. 1966, 361 F.2d 422, 425.

Lykes's appeal is based on its contention that at the time of the accident Chagois was not engaged in loading the ship. Lykes argues that he was merely *unloading* the boxcar, which had to take place before the loading operation could begin. In Lykes's view, loading of the vessel did not commence—and thus the warranty of seaworthiness could not apply—until the rice had started from the hopper of the marine leg into the vessel.

We agree with the district court that Chagois was participating in the work of loading the ship at the time of his injury and thus that he was entitled to the protection of the doctrine of seaworthiness. Chagois was a member of a gang of longshoremen employed to move bulk rice from boxcars on the pier into the hold of the SS SUE LYKES. To accomplish the job, the gang first prepared the ship's hold to receive the rice. Then the boxcars were brought alongside the hopper of the marine leg. By means of shovels and the auger, the loose rice was fed into the hopper, which moved the rice rapidly to the top of the elevator and then poured it down the spout into the ship's hold. From the moment the loose rice was started on its way by the revolving auger until it flowed into the ship's hold, only a brief interval of time—approximately 15 seconds— elapsed. As soon as one boxcar was emptied and its contents deposited in the hold, another car was moved up to take its place. At the time the accident occurred, the gang was working on its third or fourth carload of rice. Chagois was injured while he was holding down the auger; his work—as much as that of the longshoremen stationed on the ship—was an essential part of an unbroken sequence of moving the rice from the pier to the ship.[1]

---

[1]. While this opinion was being written, another panel of this Court independently reached the same conclusion on a similar set of facts.

We find support for our conclusion in the case law. Spann v. Lauritzen, 3 Cir. 1964, 344 F.2d 204, and Hagans v. Ellerman & Bucknall S.S. Co., 3 Cir. 1963, 318 F.2d 563, are mirror images of the instant case. In each of those cases the longshoreman was injured during an unloading operation, and the question was whether he was working in the service of the ship. In *Spann* the plaintiff operated the control handle of a hopper situated on the pier. A large crane would shovel the cargo—nitrate of soda —out of the ship's hold and drop it into the hopper. The plaintiff would then open the door of the hopper to let the nitrate fall into trucks waiting below. The plaintiff was injured when a load of nitrate was dropped into the hopper; because of a defective release mechanism the handle swung down suddenly and prematurely and struck him. In response to the contention that the plaintiff was engaged in loading the trucks rather than unloading the cargo, the Third Circuit said,

> He is no less [within the protection of the maritime jurisdiction] because modern ingenuity suggested the desirability of combining the unloading of the vessel with the loading of the trucks. It has frequently been said

that the doctrine of unseaworthiness is not to be rigidly construed so as to exclude from its scope modern labor saving methods and the use of modern machinery to do the work traditionally done in loading or unloading vessels. Huff v. Matson Navigation Company, 338 F.2d 205 (9th Cir. 1964); Rodriguez v. Coastal Ship Corporation, 210 F.Supp. 38 (S.D.N.Y.1962). The labor saving method here used which facilitated the removal of the cargo by motor vehicles may not be held to eliminate the unloading of the cargo from the area of traditional work of the seamen in the service of the vessel.

344 F.Supp. at 206. If the plaintiff in *Spann* was engaged in unloading the vessel as he directed the movement of nitrate from the shore-based hopper into the trucks, in the converse situation Chagois was surely engaged in loading the ship as he helped move grain from the railroad cars into the hopper.

In *Hagans* the injury occurred one step further along in the unloading process. One hundred pound bags of sand were lowered from the ship into flat trucks. The trucks were then towed into a warehouse on the pier. The plaintiff was injured while unloading

In Law v. Victory Carriers, Inc. v. Gulf Stevedore Corp., 5 Cir. 1970, 432 F.2d 376, a longshoreman was injured while operating a forklift truck used to move cargo on the dock to the loading point alongside the vessel. The overhead protection rack of the forklift came loose and fell on him. Seeking recovery against the shipowner, the longshoreman alleged that his injuries were caused by the unseaworthiness of the ship. The district court granted the shipowner's motion for summary judgment on the ground that the longshoreman was not engaged in loading the ship and therefore that he was not within the scope of the warranty of seaworthiness. Reversing the judgment, Judge Goldberg wrote,

We choose to align ourselves with the cases which define "loading" and "unloading" in a realistic sense rather than as hypertechnical terms of art. It seems to us that plaintiff Law was clearly engaged in "loading" the *Sagamore Hill* under any conventional interpretation of that term. He was part of a group of longshoremen who were engaged in the total operation of moving cargo from the dock to the vessel. Some of the longshoremen involved in the operation were on board the vessel, while others were on the dock. The efforts of both the ship-side workers and shore-side workers were necessary to load the ship. We think it would be incongruous and capricious to deny the protection of the warranty of seaworthiness to plaintiff Law while granting it to his fellow longshoremen whose duties happened to involve activities on the vessel or the actual physical act of lifting the cargo onto the ship. To deny him the benefits of the doctrine of unseaworthiness under these circumstances would be to reject the humanitarian policy which underlies the doctrine. Law was subjected to the risks and hazards of loading the ship; he should likewise receive the protections afforded those who load ships. pp. 384–385.

the cargo from the trucks and stacking them in the warehouse. Responding to the argument that plaintiff could not avail himself of the unseaworthiness remedy, the Third Circuit said, "The conclusion is inescapable that Hagans performed an integral part of the unloading of the vessel and thus as a matter of law he was in the ship's service." 318 F.2d at 571. In the language of the court, Chagois's activities in the boxcar were "an integral part" of one continuous loading operation and thus were in the service of the ship. *See also* Olvera v. Michalos, S.D.Tex.1968, 307 F.Supp. 9, 11.

Thompson v. Calmar S.S. Corp., 3 Cir. 1963, 331 F.2d 657; Byrd v. American Export Isbrandtsen Lines, Inc., E.D.Pa. 1969, 300 F.Supp. 1207, and Litwinowicz v. Weyerhaeuser S.S. Co., E.D.Pa.1959, 179 F.Supp. 812, concern the question whether the plaintiff was participating in a loading operation. In *Thompson* the plaintiff was injured while helping move gondola freight cars into position so that their contents could be loaded directly into the ship. Concluding that the plaintiff was "a member of a longshoremen's gang engaged in loading a vessel," 331 F.2d at 659–660, and that the unsafe method of loading cargo constituted unseaworthiness, the Third Circuit affirmed a judgment for the plaintiff. *Id.* at 660–661. The plaintiff in *Byrd* was struck by a forklift truck while attempting to tow another forklift truck from the back to the front of the pier so that it could be lifted aboard the ship as cargo. Denying the defendant's motion for summary judgment, the court held that "[t]he backing of [the forklift] to the intended cargo and the endeavor to attach the tow rope between the vehicles were concomitant and essential steps in the loading operation". 300 F.Supp. at 1208. The plaintiffs in *Litwinowicz* were injured while standing in a gondola car atop stacks of steel beams. As they attempted to raise the beams to place the necessary slings around them, the hoisting device broke, and the beams fell and struck the plain-

tiffs. Holding that the plaintiffs were engaged in the work of loading, the court said,

It is of no moment that the draft was raised and then lowered onto chocks before it began its upward and lateral movement into the ship. The term loading is not a work of art, and is not to be narrowly and hypertechnically interpreted. Plaintiffs' actions at the time of the accident were direct, necessary steps in the physical transfer of the steel from the railroad car into the vessel, which constituted the work of loading.

179 F.Supp. at 817–818. Similarly, Chagois's activities in the boxcar were "direct, necessary steps in the physical transfer" of the loose rice from the railroad cars on the pier into the ship's hold.

In its attempt to distinguish unloading the railroad car from loading the ship, Lykes relied heavily on the case of Drumgold v. Plovba, E.D.Va.1966, 260 F.Supp. 983. The plaintiff there had loaded a truck with boards and driven them to the edge of the pier where they were to be loaded aboard the ship. As he was attempting to put down the truck's stabilizing legs (in order to use the truck's boom and hoist to move the boards closer to the water's edge), the legs failed and the truck fell into the water, injuring the plaintiff in the process. Concluding that the plaintiff was not within the scope of the seaworthiness warranty, the court said, "we do not believe that the loading operation, insofar as the warranty of seaworthiness is concerned, commenced until the shifting boards were in the process of being physically moved from the stevedore's truck to the deck." 260 F.Supp. at 987. The correctness of that statement aside, it provides an obvious basis for distinguishing the instant case. The cargo in our case had already been brought alongside the vessel. Chagois and his gang were in the process of physically moving the cargo from the railroad cars to the ship's hold. By its

own terms then, *Drumgold* does not bar Chagois's cause of action.[2]

 Since Chagois was participating in a loading operation he is entitled to the protection of the seaworthiness warranty under Deffes v. Federal Barge Lines, Inc., 5 Cir. 1966, 361 F.2d 422. Citing Spann v. Lauritzen, *supra*, and Huff v. Matson Navigation Co., 9 Cir. 1964, 338 F.2d 205, the Court in *Deffes* made it clear that in this circuit a longshoreman injured while working on board ship or on the pier during a load-

ing operation may recover from the shipowner because of the unseaworthiness of any shore-based loading equipment.[3] Together these three cases confirm the principle that a shipowner may not escape liability by delegating the ship's work to an independent contractor. Seas Shipping Co. v. Sieracki, 328 U.S. at 95–96, 66 S.Ct. 872. Thus the shipowner's liability is not affected by the fact that the defective loading equipment was owned and operated exclusively by the stevedore. *See* Rogers

2. Similarly, we are not persuaded by the other two cases relied on by Lykes to support its contention that Chagois was not engaged in loading the ship.

In Partenweederei, MS Belgrano v. Weigel, 9 Cir. 1962, 299 F.2d 897, the plaintiff was operating a tractor that was pulling a loaded railroad car to the edge of the dock to get it within reach of the ship's loading gear when he was struck by the ship's crane boom. Attempting to justify its decision that plaintiff was not loading the vessel, the court said,

The evidence of this case relating to the nature of libelant's work is not in dispute. The libelant was driving a tractor on the dock. His job was to push or pull railroad cars loaded with lumber up to a point on the spur track where the lumber could be reached by the ship's loading gear. He did not participate in loading the lumber onto the vessel or in stowing it. He had nothing to do with ship's tackle nor did his work require him to perform any service aboard the ship. His work was performed solely on the dock and in an operation preliminary to, but separate from, the work of loading the lumber onto the vessel.

299 F.2d at 902. Without attempting to resolve any apparent conflict between Partenweederei, MS Belgrano and Thompson v. Calmar S. S. Co., *supra*, and Byrd v. American Export Isbrandtsen Lines, Inc., *supra*, we distinguish Chagois's situation on the basis of the quoted material. Chagois was required to perform part of his duties on the ship; it was only by chance that he was assigned to work on the shore at the time of his injury. Even while on the shore, his work could not in any meaningful sense be called an "operation preliminary to, but separate from, the work of loading" the ship. In any bulk grain loading operation the cargo must get from the shore—whether sitting on the pier or in railroad cars—to the

ship. To do this, the Stevedore will generally use a marine leg or elevator. But the marine leg obviously can not function unless the grain is fed into its hopper. We see no reason why the work of shoveling grain into the hopper should be separated from any other longshoremen's tasks necessary to the proper functioning of the marine leg.

In Daniel v. Skibs A/S Hilda Knudsen, 3 Cir. 1966, 368 F.2d 178, the plaintiff was hired to unload bales of licorice root from flat railroad cars and stack them in a warehouse located on the pier. Other gangs of longshoremen had unloaded the bales from the ship and placed them on the flat cars. An engine pulled the cars down the tracks to the warehouse. The plaintiff was injured when a rope broke, causing a block to fall and strike him. Finding themselves in "complete accord with the reasoning and conclusions" of the district court, the Third Circuit affirmed a judgment n. o. v. in favor of the shipowners. 368 F.2d at 179. The district court, however, carefully distinguished its case from the holdings in Spann v. Lauritzen, *supra*; Thompson v. Calmar S. S. Corp., *supra*; and Hagans v. Ellerman & Bucknall S. S. Co., *supra*. E.D.Pa.1966, 253 F.Supp. 758, 761–763. Since we believe that Chagois's case is analogous to and governed by those cases, Lykes' citation of *Daniel* is here inapposite.

3. That holding does not command the unanimous approval of the circuits. The Second and Sixth Circuits have refused to allow longshoremen recovery for unseaworthiness when the defect complained of was in a shore-based marine leg. Forkin v. Furness Withy & Co., 2 Cir. 1963, 323 F.2d 638; McKnight v. N. M. Paterson & Sons, 6 Cir. 1960, 286 F.2d 250. In *Deffes* this Court thoroughly considered the arguments advanced by those courts for denying recovery for unseaworthiness and rejected them. 361 F.2d at 425–427.

v. United States Lines, 1954, 347 U.S. 984, 74 S.Ct. 849, 98 L.Ed. 1120, rev'g 3 Cir. 1953, 205 F.2d 57; Alaska S.S. Co. v. Petterson, 1954, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798, aff'g 9 Cir. 1953, 205 F.2d 478. Nor is the shipowner immune from liability because the defective equipment is not the type of loading gear traditionally found on board a ship. Deffes v. Federal Barge Lines, Inc., 5 Cir. 1966, 361 F.2d 422, 426; Huff v. Matson Navigation Co., 9 Cir. 1964, 338 F.2d 205, 211–212.

Lykes makes much of the fact that it had no authority or control over the loading method adopted by Stevedores or the equipment furnished by them. It is clear, however, that the shipowner's lack of control over shore-based loading equipment is irrelevant to his liability for unseaworthiness. Deffes v. Federal Barge Lines, Inc., 5 Cir. 1966, 361 F.2d 422, 426; Spann v. Lauritzen, 3 Cir. 1965, 344 F.2d 204, 207. Unseaworthiness liability is "essentially a species of liability without fault" imposed on the shipowner because of his greater ability to distribute the loss throughout the shipping community that receives the benefit of the longshoreman's work and that should bear the cost of his injury. Seas Shipping Company v. Sieracki, 328 U.S. at 93–94, 66 S.Ct. 872, 90 L.Ed. at 1105–1106. Thus concepts of negligence have no place in a consideration of the unseaworthiness issue. *Id.* *See also* Mitchell v. Trawler Racer, Inc., 1960, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941. We conclude that the decision of the district court on the issue of Lykes's liability for unseaworthiness was correct.

## II.

On cross appeal Chagois asks that the district court's award of damages be increased to $125,000. We must decline to do so. The amount of damages sustained by an injured plaintiff is a question of fact. The district court found that Chagois suffered damages in an amount of $80,000. We review that finding under the "clearly erroneous"

standard of Rule 52(a) of the Federal Rules of Civil Procedure. Lloyd v. Gill, 5 Cir. 1969, 406 F.2d 585; Symonette Shipyards, Ltd. v. Clark, 5 Cir. 1966, 365 F.2d 464. Our reading of the record has convinced us that the district court's award of damages is not clearly erroneous and should not be set aside.

## III.

Chagois also complains of the district court's action in allowing interest only from the date of judgment. Chagois would have us adopt, as in a diversity case, the Louisiana rule that interest on judgments arising out of tort claims runs from the date of judicial demand. *See* L.S.A. R.S. 13:4203. This we also decline to do. In an action to enforce federal substantive rights and governed by federal procedural rules, there is no room for the application of state law. Thus we adhere to the established federal rule that in admiralty actions the matter of pre-judgment interest rests within the sound discretion of the trial court. Canova v. Travelers Insurance Co., 5 Cir. 1969, 406 F.2d 410; Haynes v. Rederi A/S Aladdin, 5 Cir. 1966, 362 F.2d 345. In the instant case the district court has properly exercised its discretion.

The judgment is affirmed.